**Case No. 21-4126**

*In the*

# United States Court of Appeals

*for the*

# Tenth Circuit

IN RE: OVERSTOCK SECURITIES LITIGATION:

THE MANGROVE PARTNERS MASTER FUND, LTD.,
*Plaintiff-Appellant,*

v.

OVERSTOCK.COM, INC., GREGORY J. IVERSON,
PATRICK M. BYRNE and DAVID J. NIELSEN,
*Defendants-Appellees.*

*Appeal from a Decision of the United States District Court for the District of Utah - Salt Lake City*
*Case No. 2:19-CV-00709-DAK · Honorable Dale A. Kimball, Senior U.S. District Judge*

## APPELLANT'S OPENING BRIEF
## [ORAL ARGUMENT REQUESTED]

MICHAEL B. EISENKRAFT, ESQ.
LAURA H. POSNER, ESQ.
COHEN MILSTEIN SELLERS & TOLL, PLLC
88 Pine Street, 14th Floor
New York, New York 10005
(212) 838-7797 Telephone
(505) 722-2629 Facsimile
meisenkraft@cohenmilstein.com
lposner@cohenmilstein.com

DANIEL H. SILVERMAN, ESQ.
MOLLY J. BOWEN, ESQ.
JOSHUA HANDELSMAN, ESQ.
COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 New York Avenue NW, Suite 500
Washington, DC 20005
(202) 408-4600 Telephone
dsilverman@cohenmilstein.com
mbowen@cohenmilstein.com
jhandelsman@cohenmilstein.com

KEITH M. WOODWELL, ESQ.
KATHERINE E. PEPIN, ESQ.
CLYDE SNOW & SESSIONS, P.C.
201 South Main Street, Suite 2200
Salt Lake City, UT 84111
(801) 322-2516 Telephone
kmw@clydesnow.com
kep@clydesnow.com

*Attorneys for Appellant The Mangrove Partners Master Fund, Ltd.*



## Corporate Disclosure Statement

Lead Plaintiff-Appellant The Mangrove Partners Master Fund, Ltd. ("Lead Plaintiff" or "Appellant") does not have a parent corporation and no publicly held corporation owns 10% or more of its stock.

# Table of Contents

Corporate Disclosure Statement ................................................................i

Table of Contents ..................................................................................ii

Table of Authorities ...............................................................................v

Disclosure of Prior or Related Appeals ...................................................xii

Jurisdictional Statement ........................................................................1

Statement of the Issues ..........................................................................2

Statement of the Case ...........................................................................4

    I.      Summary of Argument .........................................................4

          A.     The District Court Erred by Dismissing Claims Based on the Market Manipulation Scheme and Related Omissions ...........................................................4

          B.     The District Court Erred by Dismissing the Retail Fraud Claim .......................................................5

    II.     Statement of Facts .............................................................7

          A.     Defendants' Locked-Up Dividend Scheme ...................8

               1.     Defendants Deliberately Used the Locked-Up Feature of the Digital Dividend to Create a Short Squeeze and Artificially Inflate Overstock's Stock Price ............................8

               2.     The Locked-Up Feature is Revealed to Be A Ruse ...............................................................15

          B.     Defendants' Retail Fraud ..........................................16

          C.     Defendant Byrne Flees the Country and the SEC Investigates .........................................................20

    III.    Procedural History ...........................................................21

i

Argument.................................................................................22

I.    Standard of Review ..............................................................22

II.   Defendants' Scheme to Use the Locked-Up Feature of
      the Digital Dividend to Create a Short Squeeze and an
      Artificial Price was Illegal Market Manipulation in
      Violation of Rule 10b-5(a) and (c) ......................................23

      A.   Lead Plaintiff Satisfied Any Deception
           Requirement for Market Manipulation......................24

           1.   Market Manipulation Requires An Act
                Intended to Create a False Price, Not False
                Statements or Omissions ....................................25

           2.   Defendants' Omissions Concerning the
                Digital Dividend's Locked-Up Feature
                Constitute Deception .........................................32

      B.   Lead Plaintiff Satisfied Any Reliance
           Requirement for Market Manipulation......................37

           1.   This Market Manipulation Scheme
                Qualifies for the *Affiliated Ute* Presumption .....37

           2.   The District Court Erred by Finding that
                *Basic*'s Presumption of Reliance Was
                Rebutted ............................................................41

           3.   Lead Plaintiff Pled Actual Reliance ..................43

      C.   Defendants Acted with Scienter ...............................44

           1.   Defendant Byrne's Plan to Leave Overstock
                and Profit Off the Scheme ................................44

           2.   Defendant Byrne's Massive Insider Trading .....45

           3.   Defendant Byrne's Flight to a Country
                Without an Extradition Treaty...........................46

          4.     The SEC's Contemporaneous Warning and Ongoing Investigation ........................................ 47

III.    Defendants' Omissions Regarding the Locked-Up Feature Violated Rule 10b-5(b) ............................................ 48

IV.    Defendants' False and Misleading Statements Regarding the Retail Division Violated Rule 10b-5(b) ......... 50

      A.    Defendants Made False and Misleading Statements and Omissions Regarding Overstock's Retail Division ................................................................ 51

           1.     Search Engine Optimization Improvement Did Not Happen ................................................ 52

           2.     There Was No Basis for Retail Adjusted EBITDA Increases ............................................. 56

           3.     The Magnitude and Timing of the Miss ............. 57

           4.     The District Court Ignored the August 22, 2019 Statement ...................................................... 58

      B.    Defendants' Retail Statements are Not Protected by the PSLRA Safe Harbor ........................................... 59

      C.    Lead Plaintiff Satisfied the Reliance Requirement .... 60

      D.    Defendants Acted with Scienter ................................. 60

           1.     Defendant Byrne's Insider Trading ................... 60

           2.     Defendants' Actual Knowledge ........................... 61

           3.     Suspicious Timing of Defendant Iverson's Abrupt and Unexplained Departure ................. 61

           4.     Retail Sector's Critical Importance ................... 62

           5.     Magnitude of the Miss and Abrupt Reversal in Retail Adjusted EBITDA ............................... 62

6. False Justification for Reversal in Retail Adjusted EBITDA ................................................. 63

7. Ongoing SEC Investigation ................................. 63

8. Factual Errors in the District Court's Analysis of Each Individual Defendant Require Reversal ................................................. 64

V. Defendants are Liable Under Section 20(a) ......................... 65

VI. Defendant Byrne's Insider Sales Violated Rule 20A ............ 65

Conclusion and Relief Sought ................................................. 68

Statement Regarding Oral Argument .................................... 70

Certificate of Compliance ........................................................ 71

ADDENDUM

Memorandum Decision and Order,
Filed September 20, 2021 [Docket No. 137] ........................... ADD-1

Judgment in a Civil Case,
Filed September 20, 2021 [Docket No. 138] ......................... ADD-33

Certificate of Digital Submission

Certificate of Service

# Table Of Authorities

## CASES

*Adams v. Kinder-Morgan, Inc.*,
  340 F.3d 1083 (10th Cir. 2003), *as amended on denial of
  reh'g* (Aug. 29, 2003)............................................................. 58, 63, 65

*Affiliated Ute Citizens of Utah v. United States*,
  406 U.S. 128 (1972) ................................................. 5, 37, 38, 39, 40

*Alfus v. Pyramid Tech. Corp.*,
  745 F. Supp. 1511 (N.D. Cal. 1990) ............................................. 67

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013) ........................................................................ 42

*Anderson v. Spirit Aerosystems Holdings, Inc.*,
  827 F.3d 1229 (10th Cir. 2016), as amended (July 6, 2016).......... 53

*Anixter v. Home-Stake Prod. Co.*,
  977 F.2d 1549 (10th Cir. 1992) ..................................................... 29

*Apex Oil Co. v. DiMauro*,
  822 F.2d 246 (2d Cir. 1987)...................................................... 26, 27

*ATSI Commc'ns, Inc. v. Shaar Fund Ltd.*,
  493 F.3d 87 (2d Cir. 2007)....................................................... 23, 32

*Barrie v. Intervoice-Brite, Inc.*,
  409 F.3d 653 (5th Cir. 2005) ......................................................... 65

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) .......................................... 5, 29, 30, 41, 42, 43

*CGC Holding Co., LLC v. Broad & Cassel*,
  773 F.3d 1076 (10th Cir. 2014) ......................................... 37, 41, 43

*Dudley v. Haub*,
  No. 2:11-CV-05196-WJM, 2013 WL 1845519
  (D.N.J. Apr. 30, 2013) ................................................................. 58

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005) ...................................................................... 43

*Duran v. Muse*,
    No. 16-CV-717-TCK-JFJ, 2017 WL 5985568
    (N.D. Okla. Dec. 1, 2017), aff'd, 721 F. App'x 833
    (10th Cir. 2018) .......................................................................... 33

*Emps.' Ret. Sys. of Rhode Island v. Williams Cos., Inc.*,
    889 F.3d 1153, 1161 (10th Cir. 2018) .......................................... 22

*Ernst & Ernst v. Hochfelder*,
    425 U.S. 185 (1976) ...................................................................... 26

*Frey v. Commodity Futures Trading Comm'n*,
    931 F.2d 1171 (7th Cir. 1991) ...................................................... 26

*Ga. Firefighters' Pension Fund v. Anadarko Petroleum Corp.*,
    514 F. Supp. 3d 942 (S.D. Tex. 2021)........................................... 65

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
    141 S. Ct. 1951 (2021) .................................................................. 42

*Grossman v. Novell Inc.*,
    120 F. 3d 1112 (10th Cir. 1997) ............................................. 23, 50

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014) ...................................................................... 41

*In re Barclays Liquidity Cross and High Frequency Trading Litig.*,
    390 F. Supp. 3d 432 (S.D.N.Y. 2019) ........................................... 39

*In re Cypress Semiconductor Sec. Litig.*,
    836 F. Supp. 711 (N.D. Cal. 1993) ............................................... 66

*In re Daou Sys., Inc.*,
    411 F.3d 1006 (9th Cir. 2005) ...................................................... 43

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
    258 F. Supp. 2d 576, 599 (S.D. Tex. 2003)................................... 66

*In re Initial Pub. Offering Sec. Litig.*,
 671 F. Supp. 2d 467 (S.D.N.Y. 2009) .............................................. 39

*In re Level 3 Commc'ns, Inc. Secs. Litig.*,
 667 F.3d 1331 (10th Cir. 2012) ................................................ 51, 61

*In re MicroStrategy, Inc. Sec. Litig.*,
 115 F. Supp. 2d 620 (E.D. Va. 2000) ............................................ 66

*In re Myriad Genetics, Inc.*,
 No. 19-cv-00707, 2021 WL 977770
 (D. Utah Mar. 16, 2021) ...................................................... *passim*

*In re Nature's Sunshine Prod. Sec. Litig.*,
 486 F. Supp. 2d 1301 (D. Utah 2007).......................................... 63

*In re Overstock Sec. Litig.*,
 No. 2:19-CV-709-DAK-DAO, 2021 WL 4267920
 (D. Utah Sept. 20, 2021)...................................................... *passim*

*In re Oxford Health Plans, Inc.*,
 187 F.R.D. 133 (S.D.N.Y. 1999) ................................................ 66

*In re Rhythms Sec. Litig.*,
 300 F. Supp. 2d 1081 (D. Colo. 2004)........................................... 54

*In re Vivendi, SA Sec. Litig.*,
 838 F.3d 223 (2d Cir. 2016)................................................... 36

*Institutional Invs. Grp. v. Avaya, Inc.*,
 564 F.3d 242 (3d Cir. 2009)................................................... 55

*Joseph v. Wiles*,
 223 F.3d 1155 (10th Cir. 2000) ........................................ 37, 40, 41

*Jun Zhang v. LifeVantage Corp.*,
 No. 2:16- cv-965-TS, 2017 WL 2599883
 (D. Utah June 15, 2017) ...................................................... 62

*Kapur v. USANA Health Scis., Inc.*,
     No. 2:07-cv-00177-DAK, 2008 WL 2901705
     (D. Utah July 23, 2008) ................................................................. 59

*Koch v. S.E.C.,*
     793 F.3d 147 (D.C. Cir. 2015), *cert. denied,*
     577 U.S. 1235 (2016) .................................................................. 28

*Krogman v. Sterritt*,
     202 F.R.D. 467 (N.D. Tex. 2001) ..................................................... 32

*Levie v. Sears Roebuck & Co.*,
     496 F. Supp. 2d 944 (N.D. Ill. 2007) .................................. 41, 42, 43

*Longfin Corp. Sec. Class Action Litig.*,
     No. 18CV2933 (DLC), 2019 WL 1569792
     (S.D.N.Y. Apr. 11, 2019), on reconsideration, No.
     18CV2933(DLC), 2019 WL 3409684 (S.D.N.Y. July 29, 2019) ..... 35

*Lorenzo v. S.E.C.*,
     139 S. Ct. 1094, at 1101 (2019) ......................................... 25, 26, 29

*Malouf v. S.E.C.*,
     933 F.3d 1248 (10th Cir. 2019), *cert. denied*,
     140 S. Ct. 1551 (2020) .................................................................. 36

*Markowski v. S.E.C.*,
     274 F.3d 525 (D.C. Cir. 2001)......................................................... 29

*Minpeco, S.A. v. ContiCommodity Services, Inc.*,
     552 F. Supp. 332 (S.D.N.Y. 1982) ................................................... 30

*Nakkhumpun v. Taylor*,
     782 F.3d 1142 (10th Cir. 2015) ....................................................... 51

*Nanopierce Techs., Inc. v. Southridge Cap. Mgmt.*, LLC,
     No. 02-CV-0767-LBS, 2002 WL 31819207
     (S.D.N.Y. Oct. 10, 2002) ................................................................ 23

*Nat. Res. Def. Council v. McCarthy*,
     993 F.3d 1243 (10th Cir. 2021) ....................................................... 23

viii

*Peil v. Speiser*,
806 F.2d 1154 (3d Cir. 1986) ........................................................ 41

*Perle v. Fiero (In re Perle)*,
2010 WL 6259964 (B.A.P. 9th Cir. Dec. 6, 2010) ........................... 27

*Ploss v. Kraft Foods Grp., Inc.*,
197 F. Supp. 3d 1037 (N.D. Ill. 2016) ........................................... 27

*Plumber & Steamfitters Loc. 773 Pension Fund v.*
*Danske Bank A/S*,
11 F.4th 90 (2d Cir. 2021) ............................................................ 24

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004) ..................................................... 49, 50

*S.E.C. v. Lorin*,
877 F. Supp. 192, 200 (S.D.N.Y. 1995) ........................................ 27

*S.E.C. v. Masri*,
523 F. Supp. 2d 361 (S.D.N.Y. 2007) ................................. 27, 29, 30

*SEC v. Martino*,
255 F. Supp. 2d 268 (S.D.N.Y. 2003) ............................................ 24

*Set Cap. LLC v. Credit Suisse Grp. AG*,
996 F.3d 64 (2d Cir. 2021) ................................................ 26, 28, 29

*Smallen v. The W. Union Co.*,
950 F.3d 1297 (10th Cir. 2020) ............................. 44, 45, 48, 60, 63

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007) ............................................................... 22, 45

*U.S. v. Gordon*,
710 F.3d 1124 (10th Cir. 2013) .................................................... 36

*U.S. v. Martinez*,
681 F.2d 1248 (10th Cir. 1982) .................................................... 46

*United States v. Finnerty*,
533 F.3d 143 (2d Cir. 2008) ......................................................... 37

*Voulgaris v. Array Biopharma Inc.*,
 No. 17-cv-2789-KLM, 2020 WL 8367829
 (D. Colo. Nov. 24, 2020).................................................................. 60

## COURT RULES

Federal Rules of Civil Procedure 12(b)(6)............................................. 22

## REGULATIONS

17 C.F.R. § 240.10b-5 ........................................................................ 1, 25

17 C.F.R. §240.10b-5(b) ........................................................................ 51

## STATUTES

15 U.S.C. § 77 ...................................................................................... 1

15 U.S.C. § 78aa .................................................................................. 1

15 U.S.C. § 78t(a) ................................................................................. 1

15 U.S.C. § 78t1 ............................................................................... 1, 66

28 U.S.C. § 1291 .................................................................................. 1

28 U.S.C. § 1331 .................................................................................. 1

## OTHER AUTHORITIES

18 Donald C. Langevoort, Insider Trading Regulation,
 Enforcement and Prevention, § 9:3 (2020) ..................................... 67

6 Federal Register, Amendments to Regulation SHO and Rule 10a-1,
 71 FR 75068 (Dec. 13, 2006) .......................................................... 31

Final Consent Judgment, SEC v. Falcone et al.,
 No. 12-CV-5027 (S.D.N.Y. Sept. 16, 2013).................................... 26

https://www.sec.gov/litigation/admin/2022/34-93938.pdf........................ 47

Lee Davidson, Twitter suspends account of Patrick Byrne,
    former CEO of Overstock, Salt Lake Tribune, Jan. 12, 2021,
    https://www.sltrib.com/news/politics/2021/01/12/
    twitter-suspends-account/ ............................................................ 47

NASDAQ Listing Rule 5250(e)(6) ........................................................ 50

Overstock, Form 10-Q of November 4, 2021,
    available at https://investors.overstock.com/static-files
    /9f1bd420-2c87-4258-bc62-c4fbb490bc80 ................................. 21, 64

Rosalind S. Helderman, et al, Inside the 'shadow reality
    world' promoting the lie that the presidential election was stolen,
    The Washington Post, June 24, 2021,
    https://www.washingtonpost.com/politics/2021/06/24/
    inside-shadow-reality-world-promoting-lie-that-presidential-
    election-was-stolen/ ............................................................... 47, 48

SEC Rule 10b-17 .................................................................................. 50

Securities Exchange Act of 1934 § 27 ..................................................... 1

Securities Exchange Act of 1934 § 10(b) ..................................... 1, 27, 37

Securities Exchange Act of 1934 § 10b-5 ........................................ 27, 37

Securities Exchange Act of 1934 § 10b-5(a) ................. 2, 4, 27, 28, 32, 41

Securities Exchange Act of 1934 § 10b-5(b) ..................................... 27, 41

Securities Exchange Act of 1934 § 10b-5(c) ............... 4, 27, 28, 32, 37, 41

Securities Exchange Act of 1934 § 20(a) ................................................. 1

Securities Exchange Act of 1934 § 20A .......................................... 1, 7, 66

Securities Exchange Act of 1934 § 22 ..................................................... 1

U.S. SEC Litigation Release No. 22403, https://www.sec.gov/
    litigation/litreleases/2012/lr22403.htm
    (last visited 1/21/2022) .................................................................. 26

## Disclosure of Prior or Related Appeals

Case Number 20-4115 is a prior appeal in this same matter from the District Court's dismissal of the first complaint. That appeal was mooted by the District Court's grant of Lead Plaintiff's motion for leave to amend. Dkt. 119.[1]

---

[1] Citations to the Joint Appendix are abbreviated "JA" and include the volume number of the Appendix ("JA1" refers to the first volume). Citations to the District Court's docket are abbreviated "Dkt." Citations to "¶__" refer to paragraphs in the Second Amended Complaint (the "Complaint," Dkt. 120, JA4_831). Unless otherwise indicated, emphasis is added and internal punctuation is omitted.

## Jurisdictional Statement

This is an appeal from the dismissal of a securities class action alleging violations of Sections 10(b), 20(a) and 20A of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78aa, 78t(a) and 78t1, and SEC Rule 10b-5 (17 C.F.R. §240.10b-5) thereunder. Lead Plaintiff brought claims against Overstock.com, Inc. ("Overstock" or the "Company"); Patrick M. Byrne; Gregory J. Iverson; and David J. Nielsen (individually, "Appellee" or "Defendant" and collectively, "Appellees" or "Defendants"). The United States District Court for the District of Utah had federal question jurisdiction under Section 27 of the Exchange Act, 15 U.S.C. §78aa, Section 22 of the Securities Act, 15 U.S.C. §77, and 28 U.S.C. §1331. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. The District Court entered a final judgment dismissing all claims on September 20, 2021 (the "Order"). JA8_1807. Lead Plaintiff filed a timely notice of appeal on October 18, 2021. JA8_1840.

## Statement of the Issues

1.    Did Defendants' deliberate creation of a short squeeze in Overstock's own stock – a scheme designed to personally benefit Defendant Byrne by letting him sell all of his common shares at artificially inflated prices – constitute market manipulation in violation of Rule 10b-5(a) and (c) of the Exchange Act?

2.    Were Defendants' statements about the Digital Dividend false and misleading because they omitted that: (1) the Locked-Up Feature was a hoax and that they never intended to issue an unregistered Digital Dividend; (2) the Digital Dividend with the Locked-Up Feature was illegal; and (3) the true purpose of the Locked-Up Feature was to create an artificial price at which Defendant Byrne could profitably sell his common stock?

3.    Did Defendants' statements regarding the positive financial performance of Overstock's retail division violate the securities laws, given that Defendants knew or recklessly disregarded: (1) the assumptions underlying those statements were unsupportable and

impossible; and (2) the improvement in search engine optimization which Defendants claimed was driving these numbers did not occur?

4.      Were Overstock's CEO, CFO, and Retail President control persons over Overstock?

5.      Did Defendant Byrne engage in illegal insider trading when he sold all his Overstock common shares for $100 million at prices he knew were artificially inflated by both the short squeeze he engineered and Defendants' false and misleading statements about the Retail division?

## Statement of the Case

## I.     Summary of Argument

### A.     The District Court Erred by Dismissing Claims Based on the Market Manipulation Scheme and Related Omissions

The District Court held that Defendant Byrne's admitted scheme – which was to deliberately create a short squeeze so that he could harm short sellers and dump his stock at artificially inflated prices – was ***legal***, reasoning that, because certain market participants figured out that the Locked-Up Feature was designed to create a short squeeze,  the manipulation was not "deceptive" as required for a market manipulation claim under Rule 10b-5(a) and (c).  This is error for two reasons: (1) under recent Supreme Court precedent, re-affirmed by the Second Circuit last year, even manipulation conducted in broad daylight is deceptive when it is intended to create an artificial price; and (2) even if deception beyond the intention to create an artificial price is required, that requirement is fulfilled by well-pled allegation here that the Locked-Up Feature was a ruse.   The District Court failed completely to address the second argument and also failed to acknowledge Lead Plaintiff's well-pled claim that Defendants' statements concerning the Locked-Up Dividend and its purpose violated Rule 10b5-(b) by misleadingly omitting that the Locked-

Up Feature was a ruse to enrich Defendant Byrne by creating a short squeeze.

Contrary to the District Court's ruling, Lead Plaintiff's claims are entitled to a presumption of reliance under both *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) and *Basic Inc. v. Levinson*, 485 U.S. 224, 244 (1988). As a manipulative scheme with no misrepresentations at all – like *Affiliated Ute* itself – Lead Plaintiff is entitled to the *Affiliated Ute* presumption of reliance. Moreover, the District Court's holding that the presumption of reliance under *Basic* is rebutted because "price [played] no part whatsoever in [Lead Plaintiff's] decision making" is error, as the Supreme Court has held that the *Basic* presumption applies to all purchases, regardless of the "reason" or rationale for each purchase, and that the presumption cannot be rebutted at the motion to dismiss stage. Lead Plaintiff also pled actual reliance because its purchases were caused by Defendants' manipulation.

**B.    The District Court Erred by Dismissing the Retail Fraud Claim**

For the Retail Fraud claim, the District Court erred by improperly deciding factual disputes, applying the incorrect legal standard for assessing the credibility of confidential witness testimony, ignoring

certain challenged statements, and wholly overlooking key allegations of falsity and scienter. Defendants' statements regarding increases to Retail Adjusted EBITDA all rested on improved search engine optimization that had supposedly already occurred. But as allegations from confidential witnesses confirmed, those improvements never happened.

The District Court also erred in holding that certain of the Retail fraud statements were protected by the PSLRA safe harbor. Those statements were made with actual knowledge that they were false and misleading. The remaining Retail fraud statements, which the District Court ignored, were not forward-looking at all, but rather were statements of historical or current fact.

The District Court's conclusion that Lead Plaintiff failed to establish an inference of scienter was also error. The District Court improperly forgave Defendant Byrne's illegal insider trading and failed to consider numerous key allegations, including witness statements confirming that Defendants knew their retail statements were false when made, Defendant Iverson's abrupt and unexplained departure from

the Company, the magnitude of the miss, and the SEC's investigation into Overstock.

Moreover, the District Court erred in holding that Overstock's CEO, CFO, and Retail Vice President were not control persons.

Finally, the District Court incorrectly held that the timing of Lead Plaintiff's purchases of Overstock stock prior to Defendant Byrne's stock sales immunized those sales, despite Rule 20A not requiring a particular sequence of trading.

## II.    Statement of Facts

Overstock is a publicly traded e-commerce company founded by Defendant Byrne in 2002. ¶1; JA4_864.  By 2019, Overstock was in trouble.  Its core e-commerce business (the "Retail division") was unprofitable, and a strategic shift to regain market share from competitor Wayfair had failed. ¶2; JA4_865.  During these struggles, Defendant Byrne shifted Overstock's attention to a new business – blockchain technology, including tZERO, an alternative stock-trading platform. ¶3; JA4_865.  This business was also struggling, particularly after a $404 million investment of outside capital fell through.  Unable to right their sinking ship legitimately, Defendants turned to fraud. ¶¶4-5; JA4_865.

7

### A.    Defendants' Locked-Up Dividend Scheme

### 1.    Defendants Deliberately Used the Locked-Up Feature of the Digital Dividend to Create a Short Squeeze and Artificially Inflate Overstock's Stock Price

In early July of 2019, then-CEO Byrne learned (but did not disclose publicly) that he would be forced to resign from Overstock because his romantic relationship with a Russian spy was about to become public. ¶¶97, 205-207; JA4_897, 929-930.  Just a few weeks later, on July 30, 2019, Defendant Byrne and Overstock suddenly announced the issuance of a dividend via a "blockchain-based digital security token" ("Locked-Up Dividend" or "Digital Dividend")).  ¶100; JA4_898.

The Digital Dividend was unusual for two reasons.  First, Overstock would give investors a blockchain token, rather than cash or Overstock shares. Second, although Overstock is a public company traded on the New York Stock Exchange, Defendants declared that they would not register the dividend with the SEC.  ¶103; JA4_898.  Consequently, dividend recipients would be prohibited from transferring or trading the Digital Dividend for months – thus, Overstock was "locking up" the dividend.  ¶285; JA4_954-955 (the "Locked-Up Feature").  Defendants never publicly stated a business rationale for non-registration, and

indeed, that choice was at direct odds with Overstock's claimed rationale of *encouraging trading* on Overstock's alternative stock-trading platform, tZERO. ¶¶47, 199-201; JA4_880, 927-928.

Although Defendants did not have any legitimate business rationale for refusing to register the Digital Dividend, they did have a conscious purpose: to cause a short squeeze that would artificially inflate the price of Overstock's stock, harming Overstock short sellers and allowing Defendant Byrne to sell his Overstock common shares for an extraordinary profit. ¶¶97-112, 139-155; JA4_897-901, 910-917.

Intentionally creating a scenario where short sellers of a heavily shorted stock are forced to close their positions by purchasing shares – thereby creating upward pressure on the stock and causing its price to skyrocket – is a "short squeeze." ¶7; JA4_866-867. Due in part to the volatility of then-CEO Defendant Byrne, Overstock has historically been a heavily shorted stock. Defendant Byrne has a well-documented animus towards, and obsession with, short-sellers, even paying a personal economist to track short-selling of Overstock. ¶44; JA4_878-879. In July of 2019, when the Digital Dividend was announced, Overstock shares were heavily shorted, with more than half of Overstock's outstanding

shares sold short. ¶102; JA4_898. Knowing this, Defendants designed the Digital Dividend to create a short squeeze. ¶103; JA4_898. By issuing a dividend while a short seller has an open position, that short seller is contractually obligated to transmit the dividend to the lender (usually via a broker) from whom it borrowed shares. *Id*. Typically, because dividends are issued as cash or a freely tradeable security, short sellers can pay cash or transmit the freely tradeable security to the brokerage from which they borrowed the shares. *Id*. But by not registering the Digital Dividend, Defendants created a scenario where the Digital Dividend could not be traded or transferred. *Id.* Nor could lenders easily negotiate to pay short-sellers an equivalent amount of cash for the dividend, because the inability to trade it made it difficult to value. ¶¶103-104; JA4_898-899. Consequently, short-sellers' route to avoid defaulting on their contractual obligations was to close out their short positions by buying Overstock shares prior to the issuance of the Digital Dividend; this simultaneous buying spree would artificially increase demand for Overstock, and increase its trading volume and stock price, creating a short squeeze. ¶104; JA4_899.

This is exactly what occurred. The announcement of the Locked-Up Feature caused a meteoric rise in the market price of Overstock stock via the creation of an artificial short squeeze. ¶139; JA4_910-911. Specifically, "[f]rom the beginning of the short squeeze on September 3 through its peak during the trading day on September 13, Overstock's common stock price rose **97%** (from $15.07 to a 52-week high of $29.75) and trading volume increased by **776%** (from 2,122,416 to 18,613,100 shares traded)." ¶140; JA4_911. As the price rose, the amount of short interest in the stock decreased as short sellers "covering" their short positions purchased shares. ¶142; JA4_912. Financial analytics firm S3 Partners concluded that the "serious acceleration of short covering" in the days before the Locked-Up Dividend was supposed to be issued reflected that the market was "responding to an event that's changing people's trading strategies" – *i.e.*, the Locked-Up Feature. ¶144; JA4_913.

Unbeknownst to investors, Defendant Byrne had planned all along to take personal advantage of the artificial inflation he caused through the short squeeze. In July of 2019, shortly *before* announcing the Digital Dividend, Defendant Byrne created a plan to sell 200,000 of his Overstock

11

shares in September, exactly when he admittedly knew the stock price would artificially spike.   ¶130; JA4_907.   In August, Defendant Byrne learned he would need to leave Overstock due to the imminent public announcement of his relationship with a Russian spy. Right before he resigned, Defendant Byrne changed his instructions from selling 200,000 shares to "selling all my shares in mid-September," and he shared that plan with Overstock executives.   ¶131; JA4_907-908.   On August 22, 2019, Defendant Byrne announced his departure from Overstock and left the country for Indonesia.   ¶¶10 n. 4, 132, 135, 205.; JA4_868, 908-909, 910, 919.

From his base on a boat, where he had spotty internet service, Defendant Byrne monitored the short squeeze he created and its effect on Overstock's stock price.   ¶147; JA4_914.   Defendant Byrne admitted that while on the boat he learned that the SEC planned to intervene and force Overstock to postpone the Digital Dividend record date, which would end the short squeeze.   ¶146-155; JA4_913-917.   As soon as Defendant Byrne learned this, he admits that he sold all his shares to profit from the short squeeze before its artificial inflation abated. Between September 16 and 18th, Defendant Byrne sold 4.7 million share

of Overstock stock – yielding him *$90 million* in ill-gotten gains.  ¶¶12, 148-169; JA4_868-869, 914-920.  On September 18th – **the same day Defendant Byrne sold his last million shares** – Overstock ended the short squeeze by officially announcing that the Digital Dividend's record date would be postponed and that the Company was abandoning the Locked-Up Feature, so the Digital Dividend would be freely tradeable. ¶170; JA4_920.  As the news leaked out, Overstock's stock price dropped from a high of $29.75 on September 13, 2019 down to $11.19 on September 23, a decline of 62% in just ten days.  ¶149; JA4_915.

As news of Defendant Byrne's personal stock sales became public, media outlets marveled at his manipulative scheme.   Marketwatch confirmed that "Overstock founder tried to squeeze short sellers, sold out when the SEC cracked down," specifically noting that the Locked-Up Feature was intended to cause an "operational impossibility" forcing short sellers to exit their positions and driving up the stock price so Defendant Byrne could cash out.  ¶¶175-176; JA4_921-922.

Defendant Byrne admitted as much. He said:

- The situation prior to the Locked-Up Dividend was akin to, "struggling to keep the lid on the pot of boiling water… if the short positions in OSTK + daisy-chaining) had finally had to settle, **the stock would have gone up just as surely as the**

> ***water in the pot would have boiled over once the safe on its lid was removed***."

- I did "not just dream this [Locked-Up Dividend] up on a whim. [I] ***designed it carefully***," knowing full well that "it ***put legitimate short sellers in a bind***."

- "***Mr. Shorty was sleepy and stepped on his weenie***, and if the SEC objected after the fact, I would love to have met the SEC in court and put them on trial."

- He knew and intended that trading volume and share price would artificially increase as the Locked-Up Dividend record date approached: "***one thing I was certain of was that the volume had to expand in the week before the dividend record date***."

- If SEC registration was required, that would "***obviate the concern about a squeeze.***"

¶203; JA4_928-929.

These admissions confirm that Defendant Byrne: (1) deliberately designed the Digital Dividend to create a manipulative short squeeze that artificially increased the price of Overstock stock and (2) knew when he decided to sell his stock that the demand for (and, consequently the price of) Overstock stock would be artificially inflated by his manipulative short squeeze.

14

## 2.    The Locked-Up Feature is Revealed to Be A Ruse

In addition to Defendant Byrne's own admissions, revelations after the alleviation of the short squeeze demonstrated that the Locked-Up Feature was a ruse and Defendants never intended to issue the dividend in that format.    First, Defendants did not bother to create the infrastructure necessary for the Locked-Up Dividend to be issued.  ¶113; JA4_902.  They did not establish basics, like determining when NASDAQ would declare an ex-dividend date[2], how the Locked-Up Dividend would be delivered, how brokerages could obtain custody of it, and whether it was a digital asset or restricted stock.  ¶¶117-118; JA4_903-904. Moreover, Defendants announced that investors had to open a brokerage account through a broker called Dinosaur Financial to receive the Locked-Up Dividend, without even conferring with Dinosaur Financial to create a plan.  Dinosaur Financial did not have a process to open accounts for non-United States investors and did not know essential information like whether the shares were restricted.  ¶¶114-116; JA4_902-903.  The

---

[2] "Nasdaq Listing Rule 520(e)(6) and SEC Rule 10b-17 require that "the issuer of any class of securities listed on The Nasdaq Stock Market must notify Nasdaq **_no later than ten calendar days prior to the record date_** of a cash or non-cash dividend distribution." Nasdaq never issued an ex-dividend date for the Locked-Up Dividend."  ¶117 n. 9; JA4_903.

total lack of preparation undermines any claim that this was a legitimate business plan that Defendants intended to complete.

Additionally, just six days after Overstock ended the short squeeze, Overstock suddenly changed course and announced that it would eliminate the Locked-Up Feature and register the Digital Dividend. ¶185; JA4_924. In explaining this dramatic shift, Overstock's new CEO admitted that the SEC required that such a dividend be registered, stating the Company "appreciate[s] the cooperation and guidance we are receiving from regulatory authorities." *Id.* This immediate about-face further undermines the notion that there was ever a legitimate business rationale for the Locked-Up Feature.

On November 12, 2019, Overstock announced it received a subpoena from the SEC for documents related to, *inter alia*, the Locked-Up Dividend, the 10b-5-1 trading plans of Overstock's officers and directors, and communications with Defendant Byrne. ¶187; JA4_925. That investigation is ongoing.

### B.    Defendants' Retail Fraud

While the Defendants were misleading investors and manipulating the market with their Digital Dividend scheme, they were also

misleading investors about the company's Retail division. After profitless years in the Retail division (¶¶45-65; JA4_879-886), starting in May 2019, Defendants suddenly and repeatedly raised earnings guidance, justifying each upward revision with false claims that Retail already achieved necessary improvements. First, on May 9, 2019, Defendants announced that Overstock's year-end Retail Adjusted EBITDA guidance would increase by 50%, from $10 million to $15 million for the year, supposedly based on reduced expenses and increased contribution thanks in substantial part to seven consecutive months of improvement in search engine optimization ("SEO"). ¶¶66-72; JA4_886-888. The market reacted positively, and at the artificially inflated stock price, Defendant Byrne sold 15% of his Overstock common stock for a profit of $10 million. ¶¶73, 88-91; JA4_888, 895-896. Defendants raised Retail guidance again on July 15, 2019, from $15 million to $17.5. ¶¶92-93; JA4_896. Again, Defendants cited improved SEO performance for the increase. *See id.* On August 8, 2019, Overstock and Defendant Byrne reported that the "retail business has returned to positive adjusted EBITDA for the first time since the second quarter of 2017 and shows no signs of stopping." ¶268; JA4_950. On an earnings call that day,

Defendant Nielsen reiterated that Retail Adjusted EBITDA was already positive and would hit $17.5 million for the year.  ¶269; JA4_950.  On August 22, 2019, the day Defendant Byrne resigned from the Company, he again told investors that Retail had achieved positive adjusted EBITDA.  ¶274; JA4_952.[3]

The SEO improvement that these increases were supposedly based on never happened.  Confidential Witness #2 ("CW #2") worked on Overstock's website and explained that there "was never a big improvement in SEO...," and that Overstock's website had not even been updated.  ¶85; JA4_892-893.  Further, Confidential Witness #0 ("CW #0") personally spoke to Defendant Iverson about SEO drivers and how "keyword ranking, as presented, was not a meaningful metric" justifying Retail Adjusted EBITDA increases.  *Id.*  Accordingly, Defendants knew their statements to investors touting improved keyword rankings had no bearing on revenue.

---

[3] On May 9 and August 8, 2019, Overstock reported quarterly financial results in Forms 10-Q, signed by Defendant Iverson and certified by Defendants Iverson and Byrne as to accuracy and completeness. ¶¶210–212, 228; JA4_930-931, 936-937.

Detailed allegations also demonstrate the falsity of the upward adjustments to Retail Adjusted EBITDA. CW #0 recounted that Defendants knew that a key input into the Retail Adjusted EBITDA calculation was wrong and unsupportable. Defendant Iverson himself admitted to colleagues, including CW #0, that the internal Retail revenue contribution number of $20 million the Company used to justify its Retail guidance throughout the Class Period was "flat out wrong and misleading." *Id.* Nevertheless, Defendants presented Retail guidance based on that "flat out wrong" number to investors and then, over a period of months, falsely increased that already "flat out wrong" number to even more unrealistic heights with no basis. ¶66; JA4_886. About two weeks after release of second quarter 2019 results on August 8, 2019, Defendant Nielsen was personally presented with a revised Outlook that confirmed the falsity of Defendants' Retail Adjusted EBITDA claims, but he buried it and allowed yet another false reaffirmation of positive adjusted EBITDA to be made on August 22, 2019. ¶¶78, 119-121; JA4_890, 904-905.

Then on September 17, 2019, Defendant Iverson left the Company with no warning, explanation, or notice to investors. ¶241; JA4_939. On

September 23, 2019, the truth about Defendants' Retail fraud began to emerge when Overstock's new leadership shocked the market by announcing an abrupt reversal with respect to Retail's performance. ¶¶177-81; JA4_922-9224. Retail did not come close to the positive adjusted EBITDA of $17.5 million Defendants had told investors about just weeks before; instead, Overstock's new leaders ultimately reported on March 13, 2020 an adjusted EBITDA of *negative* $2.2 million – a "miss" of more than 100%. ¶178; JA4_9222-9223.

Overstock's claimed justifications for the reduction were increased costs from tariffs on goods manufactured in China; increased D&O insurance costs; waning consumer confidence; increased freight costs; and a delay in increased web search traffic translating into purchasing customers. ¶216; JA4_932. But none of these factors represented a change at all, much less a change of the magnitude necessary to explain the shift in Retail guidance. ¶¶217-219; JA4_932-933.

## C. Defendant Byrne Flees the Country and the SEC Investigates

Thanks to the artificial inflation caused by his frauds, Defendant Byrne made over $100 million from illegal insider sales. From Indonesia – a country he admittedly chose because it did not have a criminal

extradition treaty with the United States – he announced that he had invested his ill-gotten gains into gold, silver, and cryptocurrency to move his money beyond the government's reach and shield it from "retaliation from the Deep State," his nickname for the SEC and other regulators. ¶¶65, 117, 152, 173; JA4_886, 903-904, 916, 920.

On October 7, 2019, the SEC subpoenaed documents relating to the Locked-Up Dividend, the insider trading plans of Overstock's officers and directors, and communications with Defendant Byrne. ¶193; JA4_926. That investigation quickly expanded, with follow-up subpoenas in December 2019 requesting documents relating to tZERO, insider trading policies, and employment and consulting agreements. ¶194; JA4_926. And then, just a day after Defendants filed their motion to dismiss, Overstock announced the SEC's investigation had further expanded into the Retail fraud.[4] Those investigations are still pending.

## III. Procedural History

After being appointed Lead Plaintiff, Mangrove filed its Consolidated Complaint on March 13, 2020. Dkt. 75; JA1_35. On

---

[4] *See* Overstock, Form 10-Q of November 4, 2021 at 21, available at https://investors.overstock.com/static-files/9f1bd420-2c87-4258-bc62-c4fbb490bc80

September 28, 2020, the District Court granted Defendants' motions to dismiss pursuant to Rule 12(b)(6) and entered judgment. Dkt. 103; JA4_832.

On October 23, 2020, Mangrove moved for leave to file an amended complaint. Dkt. 105. During the pendency of that motion, Lead Plaintiff filed a notice of appeal of the District Court order granting the motion to dismiss. Dkt. 108. On January 6, 2021, the District Court granted the motion for leave to amend. Dkt. 119; JA4_859. The appeal was thus mooted and dismissed. Tenth Circuit, No. 20-4115 (January 8, 2021).

The operative complaint was filed on January 11, 2021. Dkt. 120 ("Complaint"); JA4_861. On September 20, 2021, the District Court dismissed the Complaint pursuant to Rule 12(b)(6) and entered judgment. Dkts. 137, 138; JA8_1807, 1839.

## Argument

## I.    Standard of Review

This Court reviews *de novo* a district court's grant of a motion to dismiss under Rule 12(b)(6). *See Emps.' Ret. Sys. of Rhode Island v. Williams Cos., Inc.*, 889 F.3d 1153, 1161 (10th Cir. 2018). The Court must consider the Complaint in its entirety, *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 309-310 (2007), and "accept all the well-pleaded

allegations of the complaint as true," construing them "in the light most favorable to the plaintiff." *See Nat. Res. Def. Council v. McCarthy*, 993 F.3d 1243, 1250 (10th Cir. 2021); *Grossman v. Novell Inc.*, 120 F. 3d 1112 at 1118 (10th Cir. 1997).

## II. Defendants' Scheme to Use the Locked-Up Feature of the Digital Dividend to Create a Short Squeeze and an Artificial Price was Illegal Market Manipulation in Violation of Rule 10b-5(a) and (c)

"[B]ecause market manipulation cases often 'involve facts solely within the defendant's knowledge ... the plaintiff need not plead manipulation to the same degree of specificity as a plain misrepresentation claim.'" *In re Overstock Sec. Litig.*, No. 2:19-CV-709-DAK-DAO, 2021 WL 4267920, at \*10 (D. Utah Sept. 20, 2021) ("*Overstock*"), quoting *ATSI Commc'ns, Inc. v. Shaar Fund Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007). The plaintiff need only "lay out the nature, purpose, and effect of the fraudulent conduct and the roles of the defendant without requiring specific instances of the conduct." *Id.* (quoting *Nanopierce Techs., Inc. v. Southridge Cap. Mgmt.*, LLC, No. 02-CV-0767-LBS, 2002 WL 31819207, at \*5 (S.D.N.Y. Oct. 10, 2002)).

To state a market manipulation claim, a plaintiff must show: "(1) that the defendant committed a deceptive or manipulative act, (2) in

furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021). "[S]ufficient proof of manipulation [exists] if the manipulator caused either actual or apparent activity or caused a rise in the market price." *In re Overstock Sec. Litig.*, No. 2:19-CV-709-DAK-DAO, 2020 WL 5775845, at *10 (D. Utah Sept. 28, 2020), (quoting *SEC v. Martino*, 255 F. Supp. 2d 268, 286 (S.D.N.Y. 2003)). Lead Plaintiff satisfied these elements.

### A. Lead Plaintiff Satisfied Any Deception Requirement for Market Manipulation

Defendants do not dispute that Overstock's decision not to register the Digital Dividend caused a short squeeze that artificially inflated the market price of Overstock stock. ¶140-149, 285; JA4_911-915, 954-955. Nonetheless, the District Court held that this overtly manipulative scheme was ***legal*** because "Defendants could not manipulate the market via truthful statements or via a dividend that everyone immediately knew would impact short sellers." *Overstock*, 2021 WL 4267920, at *11.

This is error for two reasons, each of which independently requires reversal: (1) Defendants' intention to create a false price satisfies any deception requirement for market manipulation; and (2) Defendants'

failure to disclose that the Locked-Up Feature was a ruse and that Defendant Byrne would personally benefit from the short squeeze constituted deceptive omissions for market manipulation.

> ### 1. Market Manipulation Requires An Act Intended to Create a False Price, Not False Statements or Omissions

Rule 10b–5 makes it unlawful: "(a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact ..., or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit ..." 17 C.F.R. § 240.10b–5 (2018). Rule 10b-5(b) bars false statements. However, as the Supreme Court recently clarified, market manipulation claims under 10b-5(a) and (c) encompass "a wide range of conduct" that need not include false statements independently covered by 10b-5(b). *Lorenzo v. S.E.C.*, 139 S. Ct. 1094, at 1101, 1104 (2019). Instead, manipulation "refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity," and "connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of

securities." *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 76 (2d Cir. 2021); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976).

Defendants' intentional creation of a short squeeze to artificially inflate the price of Overstock stock falls well-within the "wide range of conduct" prohibited by the securities laws. *Lorenzo,* 139 S. Ct. at 1101, 1104. While Defendants' conduct here – their use of the Locked-Up Feature of the Digital Dividend – is in some ways novel, the intentional creation of a short squeeze to create an artificial price has long been recognized by courts and regulators as an illegally manipulative act. An "illegal short squeeze" is "a market manipulation scheme in which an investor constricts the supply of a security, through large purchases or other means, with the intent of forcing settlement from short sellers at arbitrary and inflated prices."[5] *See also Frey v. Commodity Futures Trading Comm'n*, 931 F.2d 1171, 1175 (7th Cir. 1991) (an intentional short squeeze is always price manipulation unless the scarcity was caused by natural forces); *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 260

---

[5] Final Consent Judgment, *SEC v. Falcone et al.*, No. 12-CV-5027 (S.D.N.Y. Sept. 16, 2013); U.S. SEC Litigation Release No. 22403, https://www.sec.gov/litigation/litreleases/2012/lr22403.htm (last visited 1/21/2022).

(2d Cir. 1987) (conspiracy to engineer a short squeeze constituted market manipulation under the Commodities Exchange Act); *S.E.C. v. Lorin*, 877 F. Supp. 192, 200 (S.D.N.Y. 1995) (defendants manipulated the market with scienter in violation of rule 10b-5 by buying and selling shares of TS stock pursuant to an agreement to effect a short squeeze); *Perle v. Fiero (In re Perle),* 2010 WL 6259964 at *4, *10 (B.A.P. 9th Cir. Dec. 6, 2010) (noting that the district court found that appellant violated Exchange Act Section 10(b) and Rule 10b-5 by engaging in a "short squeeze").

In holding otherwise, the District Court erred by applying an improperly narrow definition of what "deception" means in the context of market manipulation claims under Rule 10b-5(a) and (c).  Unlike 10b-5(b) claims involving false statements or omissions, a deceptive "manipulative act" in the market manipulation context is satisfied by the defendant's ***intent*** to create an artificial, or deceptive, ***price***.  It does not require that any investors actually be deceived about a fact or told a lie.[6]

---

[6] This is to the extent that "deception" is required at all.  Many courts have held it is not. *See, e.g. Ploss v. Kraft Foods Grp., Inc.*, 197 F. Supp. 3d 1037, 1054 (N.D. Ill. 2016) ("Although it is true that most forms of manipulation involve deception in one form or another,' Rule 10b-5 'requires proof of either deception *or* manipulation.") (quoting 47 F.3d at 865(cleaned up)); *S.E.C. v. Masri*, 523 F. Supp. 2d 361, 371 (S.D.N.Y. 2007) ("[T]he Court declines to adopt defendants' proposed *per se* rule

For example, in *Set Capital,* a recent Second Circuit case, the defendant argued that its hedging trades could not be manipulative under 10b-5(a) and (c) because they were "done openly" for the legitimate purpose of "manag[ing] risk," not deceiving investors. *Set Cap. LLC*, 996 F.3d at 76–78. The Second Circuit disagreed, holding that hedging trades, even if ***known to investors*** and potentially legitimate in some circumstances, could still violate Rule 10b-5(a) and (c) if done with the ***intent*** to manipulate the market and create an artificial price. Indeed, numerous courts have held "open-market activity" – *i.e.*, activity visible to the market – to be a violation of the securities laws, as long as the open-market activity was done with the intention to artificially impact the price of the security at issue. *See id.* ("Open-market transactions that are not inherently manipulative may constitute manipulative activity when accompanied by manipulative intent."). *See also Koch v. S.E.C.,* 793 F.3d 147, 153–54 (D.C. Cir. 2015), cert. denied, 577 U.S. 1235, 136 S.Ct. 1492, 194 L.Ed.2d 586 (2016) (a "burst of trading" on the open market, combined with the intent to manipulate price, violates the

---

that open-market activity cannot be considered manipulative based solely on manipulative intent, that is, without additional deceptive or fraudulent conduct.").

Exchange Act); *Markowski v. S.E.C.*, 274 F.3d 525, 529 (D.C. Cir. 2001) ("manipulation can be illegal solely because of the actor's purpose"); *Masri*, 523 F. Supp. 2d at 373 (holding that a transaction is manipulative if it would not have been entered into but-for manipulative intent).

In other words, intent to create a deceptive or artificial price constitutes deception for market manipulation, even if the market knows that the defendant is enacting a scheme. *Set Cap. LLC*, 996 F.3d at 77 (where defendant intends to artificially manipulate the stock price "it is no defense [to market manipulation] that [defendant's] transactions were visible to the market and reflected otherwise legal activity"). This interpretation is fully in accord with the intent of the statute, which was designed "to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Lorenzo*, 139 S. Ct. at 1103. *See also Anixter v. Home-Stake Prod. Co.*, 977 F.2d 1549, 1552 (10th Cir. 1992) ("the Securities Acts are to be broadly construed to achieve their remedial goals.").

This interpretation is also sensible from a public policy perspective. One of the stock market's prime functions is "price discovery" – to balance supply and demand and create a price reflecting that balance. *See Basic*,

485 U.S. at 244 ("The market is acting as the unpaid agent of the investor, informing him that given all the information available to it, the value of the stock is worth the market price."); *Masri,* 523 F. Supp. 2d at 371 ("[T]he purpose of securities law [is] to 'prevent practices that impair the function of stock markets in enabling people to buy and sell securities at prices that reflect undistorted (though not necessarily accurate) estimates of the underlying economic value of the securities traded.'"). By purposefully using the Locked-Up Feature to manufacture a short squeeze, Defendants artificially upended the normal legitimate forces of supply and demand, creating a deceptive market price for Overstock stock. Such conduct constitutes illegal manipulation because the price increases "would not represent *genuine* demand; that is, it would not reflect increased desire of buyers for the product, to the contrary, it would result from the alleged … manipulation of the market." *Minpeco, S.A. v. ContiCommodity Services, Inc.,* 552 F. Supp. 332, 335 (S.D.N.Y. 1982) (causing short squeeze was illegal manipulation). Defendants' creation of a manipulated price harmed all purchasers of Overstock shares during the artificial inflation period – whether short or long – as well as the

integrity of the public markets.[7]  The fact that certain investors may have known a short squeeze was underway does not negate that harm.

Moreover, a ruling that Defendants' manipulative scheme is legal would sow chaos in the securities markets and reduce their efficiency.  If any public company could intentionally create a short squeeze, other companies would likely follow Overstock's example.  Even the possibility of them doing so would chill investors' ability to sell short, a legal investment technique which plays an important role in promoting market efficiency.  *See* Gamestop HR Hearing – Committee Memorandum ("The U.S. Securities and Exchange Commission (SEC) has repeatedly noted that short selling provides liquidity and price efficiency"); 6 Federal Register, Amendments to Regulation SHO and Rule 10a-1, 71 FR 75068, 75069-75070 (Dec. 13, 2006) ("Short selling provides the market with at least two important benefits: market liquidity and pricing efficiency . . . short sellers add to stock pricing

---

[7] Contrary to the District Court's suggestion, Lead Plaintiff is not asking for "special treatment" of short sellers.  *In re Overstock Sec. Litig.*, 2020 WL 5775845, at *10.  All purchasers of Overstock stock during the Class Period were harmed by Defendants' market manipulation scheme by being forced to pay artificially inflated prices, and Lead Plaintiff seeks redress for all such purchasers.  ¶311; JA4_963.

efficiency because their transactions inform the market of their evaluation of future stock price performance. This evaluation is reflected in the resulting market price of the security."); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d at 101 ("Aside from providing market liquidity, short selling enhances pricing efficiency by helping to move the prices of overvalued securities toward their intrinsic values.").[8]

### 2. Defendants' Omissions Concerning the Digital Dividend's Locked-Up Feature Constitute Deception

While the law is clear that the only deception, if any, required to constitute manipulation under Rule 10b-5(a) and (c) is intent to create an artificial price, even under a theory that manipulation under Rule 10b-5(a) and (c) requires a false statement or omission to investors, Lead Plaintiff has satisfied that theory through well-pled allegations that Defendants' public statements about the Digital Dividend omitted key information. Specifically, they omitted that: (1) the Locked-Up Feature was a hoax and that they never intended to issue an unregistered Digital

---

[8] Indeed, the amount of short interest in a stock is a key factor courts use to measure market efficiency at the class certification stage. *See e.g., Krogman v. Sterritt*, 202 F.R.D. 467, 477-78 (N.D. Tex. 2001) (describing the so-called "*Krogman* Factors", including short interest).

Dividend; (2) the Digital Dividend with the Locked-Up Feature was illegal; and (3) the true purpose of the Locked-Up Feature was to create an artificial price at which Defendant Byrne could profitably sell his common stock.

Defendants discussed the Digital Dividend and its Locked-Up Feature in detail on July 30, 2019 in a Form 8-K and a Form 10-Q, affirmatively stating, "Series A-1 Shares received pursuant to the Dividend will initially be subject to trading restrictions" (the Locked-Up Feature), and that the purpose of the Digital Dividend was creating a "legal block chain capital market." ¶¶283-290; JA4_954-957.

The District Court held Defendants could not be liable under Rule 10b-5(a) or (c) because it found that there was ***nothing*** deceptive about Defendants' short-squeeze scheme or statements about the scheme. *See Overstock*, 2021 WL 4267920, at *10-12. This finding erroneously ignored plausible allegations in the Complaint and failed to make inferences in favor of Lead Plaintiff. *Duran v. Muse*, No. 16-CV-717-TCK-JFJ, 2017 WL 5985568, at *4 (N.D. Okla. Dec. 1, 2017), aff'd, 721 F. App'x 833 (10th Cir. 2018) (at motion to dismiss, "the Court must accept Plaintiff's allegations as true and grant all inferences in favor of Plaintiff.").

First, when analyzing whether the scheme was "deceptive," the District Court ignored the allegation that the Locked-Up Feature was a ruse and that Overstock never intended to issue the Digital Dividend. *See Overstock*, 2021 WL 4267920, at *10–12. Nowhere did Defendants disclose that the Locked-Up Feature was a ruse and that the Digital Dividend was not going to be issued with the Locked-Up Feature. *Id.*

This concealment was essential to the success of Defendants' short squeeze. Defendant needed to persuade short-sellers that the Digital Dividend would be issued with the Locked-Up Feature and that, consequently, they should purchase Overstock shares to close out their positions prior to its issuance. If short-sellers knew the truth – that the Digital Dividend would not be issued with the Locked-Up Feature – they would not have closed out their short positions by purchasing Overstock shares at artificially inflated prices and the short squeeze would never have occurred. ¶¶111-112; JA4_901. This oversight alone is reversible error.

Second, it was "deceptive" for Overstock to conceal that the SEC would not permit the Digital Dividend to be issued with the Locked-Up Feature. Defendant Byrne himself, as well as others, knew at the time

that the SEC was going to force Overstock to register the Digital Dividend; ultimately, Overstock announced it was going to register the Digital Dividend, and simultaneously Overstock publicly thanked the regulatory authorities for their "guidance."  ¶¶151-155, 185; JA4_915-917, 9244.  *Id.*  A plausible inference is that Overstock registered the Digital Dividend because the SEC told them to do so, because the Locked-Up Feature was illegal – an omission that is also deceptive under any definition.[9]  *See Longfin Corp. Sec. Class Action Litig.*, No. 18CV2933 (DLC), 2019 WL 1569792, at *8 (S.D.N.Y. Apr. 11, 2019), on reconsideration, No. 18CV2933(DLC), 2019 WL 3409684 (S.D.N.Y. July 29, 2019) (allegations that shares were listed on NASDAQ despite being outside the ambit of Regulation A+ are adequate to state a claim that [defendant] participated in a scheme cognizable under Rule 10b-5…").

Third, it was deceptive for Defendants to conceal that the Locked-Up Feature's true purpose was to personally benefit Defendant Byrne by

---

[9] The District Court erroneously failed to grant all inferences in Lead Plaintiff's favor when it held that Overstock's statement that it "appreciate[s] the cooperation and guidance we are receiving from regulatory authorities" regarding Overstock's reversal of its prior stance and registration the Digital Dividend, does not support the claim that the Locked-Up Feature was unacceptable to the SEC.  *Overstock*, at *11.

creating an artificial increase in the price of Overstock shares that he could sell all of his common stock at. The District Court erred in holding that Defendants' silence was irrelevant to the market manipulation claim because they had no duty to speak truthfully about the Locked-up Feature's purpose. *Overstock*, 2021 WL 4267920, at *11. It is well-established that once a defendant chooses to speak on a subject, they must speak fully and completely. *U.S. v. Gordon*, 710 F.3d 1124, 1142 (10th Cir. 2013); *In re Vivendi, SA Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016). Thus, when Overstock and Defendant Byrne chose to describe the purpose of the Digital Dividend, they were obligated to speak truthfully. ¶¶283-290; JA4_954-957 (identifying the purpose of the Digital Dividend as creating a "legal block chain capital market."). Their omission of the *true* purpose from their description is an actionable misleading omission that renders Defendants' scheme deceptive.

All of these omissions constitute deception for market manipulation. If Defendants' scheme **or** Defendants' statements intrinsic to the scheme were deceptive, that is sufficient for scheme liability purposes. *See, e.g., Malouf v. S.E.C.*, 933 F.3d 1248, 1260 (10th Cir. 2019), *cert. denied*, 140 S. Ct. 1551, 206 L. Ed. 2d 386 (2020) (false and misleading statements

can trigger liability under Rule 10b-5(c)); *United States v. Finnerty*, 533 F.3d 143, 148 (2d Cir. 2008) (citation omitted) ("[c]onduct itself can be deceptive, and so liability under § 10(b) or Rule 10b–5 does not require a specific oral or written statement.").

## B.   Lead Plaintiff Satisfied Any Reliance Requirement for Market Manipulation

### 1.   This Market Manipulation Scheme Qualifies for the *Affiliated Ute* Presumption

"[T]*he Affiliated Ute* presumption posits that when a theory of securities fraud is based on a fraudulent failure to disclose material facts, courts do not require the plaintiff to counterfactually demonstrate that it would have relied on the omitted material information; instead, the court permits the factfinder to presume that they would have done so." *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1095 (10th Cir. 2014). To determine whether the *Affiliated Ute* presumption applies, a court must engage in a "context-specific" inquiry, "analyz[ing] the complaint to determine whether the offenses it alleges can be characterized primarily as omissions or misrepresentations." *Joseph v. Wiles*, 223 F.3d 1155, 1162 (10th Cir. 2000). If the market manipulation can be primarily categorized as one of omissions and not misrepresentations, reliance is presumed under *Affiliated Ute*.

37

Here, Lead Plaintiff's market manipulation theory is based not just primarily, but exclusively, on omissions. Lead Plaintiff alleges that the description of the Locked-Up Dividend scheme omitted to disclose to the market that: (1) the Locked-Up Feature was a hoax and that they never intended to issue an unregistered Digital Dividend; (2) the Digital Dividend with the Locked-Up Feature was illegal; and (3) the true purpose of the Locked-Up Feature was to create an artificial price at which Defendant Byrne could profitably sell his common stock. These omissions caused the short squeeze and the harm to shareholders because, without them, the short-sellers would have known that the Digital Dividend would never be issued with the Locked-Up Feature and so would not have closed their positions.

The District Court held *Affiliated Ute* does not apply because the alleged scheme constituted "affirmative conduct." *Overstock*, 2021 WL 4267920, at *14. This is error for two independent reasons.

First, whether a scheme involves "affirmative conduct" is not relevant to the *Affiliated Ute* analysis. This Circuit has never held that *Affiliated Ute* is inapplicable to "affirmative conduct" or a manipulative scheme involving omissions. Indeed, courts, including the Supreme

Court in *Affiliated Ute*, regularly hold that allegations based on affirmative conduct are entitled to the *Affiliated Ute* presumption. In *Affiliated Ute* itself the scheme involved conduct: preparing and notarizing transfer papers under dubious circumstances, soliciting standing orders, and promoting a market for the stock at issue. *See Affiliated Ute*, 406 U.S. at 146. All of these actions are "affirmative conduct," and yet the Supreme Court held that the presumption applied because the case was one of omissions, not misrepresentations. *Id*. at 153; *see also In re Barclays Liquidity Cross and High Frequency Trading Litig.*, 390 F. Supp. 3d 432, 448 (S.D.N.Y. 2019) (applying *Affiliated Ute* where omissions involved defendants' manipulation); *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 496 (S.D.N.Y. 2009) (applying the *Affiliated Ute* presumption in a market manipulation case and noting that "*Affiliated Ute* itself was a case based on manipulative conduct").

Because Lead Plaintiff's allegation that Defendants' conduct manipulated the market is not premised on any affirmative

misrepresentations, it falls squarely within the caselaw applying the *Affiliated Ute* presumption.[10]

Second, even if it were appropriate to analyze affirmative "conduct" in addition to misrepresentations, here the "conduct" is primarily categorized by omissions. The Locked-Up Feature only worked because the truth – that it was a ruse that would never take place whose purpose was to create an artificial price via a short squeeze and enrich Defendant Byrne – was omitted. As the District Court itself found, the words used to describe the Locked-Up Dividend were literally true – but they became deceptive when considering the omitted information. *See Overstock*, 2021 WL 4267920, at *11 ("Defendants could not manipulate the market via truthful statements"). This is a paradigmatic situation where *Affiliated Ute* applies.

---

[10] The one case on which the District Court relies does not support its position as it does not distinguish between "affirmative conduct" and omissions. Rather, it makes the standard inquiry as to whether the claim "can be characterized primarily as omissions or **misrepresentations**." *Joseph*, 223 F.3d at 1162.

### 2. The District Court Erred by Finding that *Basic*'s Presumption of Reliance Was Rebutted

The fraud-on-the-market theory recognized by the Supreme Court in *Basic*, 485 U.S. at 248 "allows plaintiffs to benefit from a relaxed pleading standard that grants them a rebuttable presumption of reliance on the value of an allegedly fraudulent security price." *CGC Holding Co.,* 773 F.3d at 1095.[11]  The District Court held that the *Basic* presumption was rebutted because "price [played] no part whatsoever in [Lead Plaintiff's] decision making." *Overstock*, 2021 WL 4267920, at *14, quoting *Levie v. Sears Roebuck & Co.*, 496 F. Supp. 2d 944, 949 (N.D. Ill. 2007).  This is reversible error for two independent reasons.

First, under *Basic*, the presumption of reliance applies to *all* purchases regardless of the "reason" for each purchase – including purchases made by short-sellers. *See, e.g., Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 273-74 (2014) (*Basic* even applies to investors who do "not believe that the market price accurately reflects public information at the time he transacts.").  Even the caselaw cited by

---

[11] The fraud on the market presumption applies to 10b-5(a) and (c) claims as well as 10b-5(b) claims.  *See, e.g., Peil v. Speiser*, 806 F.2d 1154, (3d Cir. 1986) (holding that the fraud on the market theory applies to 10b-5(a) and (c) cases); *Joseph*, 223 F.3d at 1162 (same for 10b-5(b) cases).

the District Court affirms this point.  In *Levie v. Sears, Roebuck & Co.*, the district court certified the class, applied the *Basic* presumption, and rejected the argument that short sellers could not rely on *Basic*.  496 F. Supp. 2d at 949 ("the court ***disagrees*** with defendants' position that short sellers, day traders and option traders must be excluded from the class because they can not rely on the fraud-on-the-market theory").  In fact, the full quotation, which the District Court elided, emphasized how difficult it would be to rebut the presumption under those grounds as it would require "convincing proof" that price paid "no part whatsoever in their decision making." *Id*. No such "convincing proof" was or can be provided at the motion to dismiss stage here.

Second, it was error to rebut *Basic* at the motion to dismiss stage. *Basic*'s presumption of reliance can be rebutted only at summary judgment, trial, or, in certain specified circumstances, class certification. *See, e g., Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 482 (2013) (explaining that rebuttal of the *Basic* presumption "is a ***matter for trial***" or a "***summary-judgment motion***"); *see also Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1962, 210 L. Ed. 2d 347 (2021) ("*Halliburton  II* held that defendants may rebut the *Basic*

presumption *at class certification*" if "the particular misrepresentation at issue did not affect the stock's market price.").  The *Basic* presumption is a relaxed "*pleading standard*" that cannot be rebutted prior to discovery.  *See CGC Holding Co., LLC*, 773 F.3d at 1095.[12]  Thus, it was reversible error for the District Court to find the presumption rebutted at the motion to dismiss stage.

### 3.    Lead Plaintiff Pled Actual Reliance

Further, Lead Plaintiff satisfied the reliance requirement because it pled actual reliance, not merely its entitlement to a presumption.  The essence of reliance is "transaction causation." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005).  To prove reliance, "the plaintiff must show that, but for the fraud, the plaintiff would not have engaged in the transaction at issue." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1025 (9th Cir. 2005).  Here, Defendants' purported rebuttal of the *Basic* presumption was that the alleged scheme forced Lead Plaintiff to make cover purchases of stock to satisfy contractual obligations.  In other words, Defendants—and the District Court—conceded that the alleged

---

[12] Even *Levie*, cited by the District Court, was a class certification decision.

scheme *caused* Lead Plaintiff's transactions. This demonstrates that the element of reliance—properly understood as transaction causation—has been adequately pled.

## C.    Defendants Acted with Scienter

The "PSLRA requires Plaintiff to plead particularized facts that give rise to an inference that is at least as cogent as any competing, nonculpable explanation for a Defendants' conduct." *In re Overstock Sec. Litig.*, 2020 WL 5775845, at \*9. The allegations in the Complaint fulfill these requirements for Defendant Byrne and, through him, Defendant Overstock. *Smallen v. The W. Union Co.*, 950 F.3d 1297, 1312 (10th Cir. 2020) (senior controlling officer's scienter "may be attributed to the corporation itself").

### 1.    Defendant Byrne's Plan to Leave Overstock and Profit Off the Scheme

Defendant Byrne, *after the fact*, admitted on social media that: (1) he deliberately designed the Locked-Up Dividend to create a short squeeze and (2) when Defendants launched the Locked-Up Dividend, Defendant Byrne knew he would be leaving Overstock shortly and planned to sell his common stock at the artificially inflated price that the short squeeze would cause. Specifically, Defendant Byrne admitted

"everything was in a perfect place, perfect time for me to resign"; he "had an idea" that his departure "was coming since last July" and had "been preparing very carefully" by putting the blockchain technology in place, and he "designed [the Digital Dividend] carefully," knowing that "it put legitimate short sellers in a bind."  ¶133; JA4_909.

Defendant Byrne also admitted that, in July, *before* the Locked-Up Dividend was publicly announced, he intended to sell 200,000 shares of his stock "into the volume" (and price) swell that the Locked-up Dividend would cause.  ¶¶93, 131; JA4_896, 907-908.  These admissions are all strong evidence of scienter.

## 2. Defendant Byrne's Massive Insider Trading

Defendant Byrne's sale of 100% of his common stock for $90 million during the artificial inflation caused by the short squeeze was suspicious in timing and amount, and thus strong evidence of scienter.  *See Tellabs, Inc.*, 551 U.S. at 325 (financial motive is strong evidence of scienter); *see also Smallen*, 950 F.3d at 1310; *In re Myriad Genetics, Inc.*, No. 19-cv-00707, 2021 WL 977770, at *21 (D. Utah Mar. 16, 2021). This sale far exceeded his pre-Class Period sales, the largest of which was 16% of holdings.  ¶176; JA4_921-922.  *In re Myriad Genetics, Inc.*, 2021 WL

977770, at *21 (sales of 10% and 23% of holdings, or exceeding pre-class period sales, are suspicious). The sales occurred during the artificial spike caused by the Locked-Up Dividend; Defendant Byrne admitted that he waited to sell until he learned that Overstock was "gonna get intense heat to postpone Record date," and so the short squeeze would be ending. ¶152; JA4_916. That timing is also highly suspicious. *In re Myriad Genetics, Inc.*, 2021 WL 977770, at *21.

The District Court erred in holding that the sales were not suspicious because they were not "dramatically out of line with past trading practices." *Overstock*, 2021 WL 4267920 at *13. Furthermore, it ignores that the SEC believes that Defendant Byrne's stock sales were sufficiently suspicious as to require an ongoing investigation. ¶¶187, 196, 236; JA4_925, 927, 938.

### 3. Defendant Byrne's Flight to a Country Without an Extradition Treaty

Defendant Byrne's decision to flee to a country specifically chosen because it does not have an extradition treaty is further evidence of scienter. ¶240; JA4_939. *See U.S. v. Martinez*, 681 F.2d 1248, 1256 (10th Cir. 1982) ("flight has been viewed as an admission . . . express[ing] consciousness of guilt.").

### 4. The SEC's Contemporaneous Warning and Ongoing Investigation

The Complaint supports that the SEC instructed Overstock during the Class Period that the Locked-Up Feature was illegal and needed to be registered before it was offered. ¶¶7, 113, 148-150, 153, 176; JA4_866, 902, 914-915, 916, 921-922. This intense regulatory scrutiny supports an inference of scienter. *In re Myriad Genetics, Inc.*, 2021 WL 977770, *21-22 (finding FDA demand that defendant stop offering certain tests or first seek FDA approval supportive of scienter). That the SEC immediately began an investigation into the Locked-Up Dividend and Defendant Byrne's stock sales during the short squeeze caused by it, and that the investigation is still ongoing, also supports an inference of scienter.[13]

---

[13] More recently, the SEC entered an Order finding that Overstock *willfully* violated certain regulations in connection with its tZero platform. *See* https://www.sec.gov/litigation/admin/2022/34-93938.pdf. Additionally, Defendant Byrne's notoriety has continued due to his lead role promoting the claim that the 2020 election was stolen, including attending White House meetings to discuss illegal options to keep then-President Donald Trump in power. Lee Davidson, Twitter suspends account of Patrick Byrne, former CEO of Overstock, *Salt Lake Tribune*, Jan. 12, 2021, https://www.sltrib.com/news/politics/2021/01/12/twitter-suspends-account/. Byrne is profiting from these claims, earning an estimated $1.5 million per year from subscriber-only content on a blog where he peddles his conspiracy theories. *Rosalind S. Helderman, et al*, Inside the 'shadow reality world' promoting the lie that the presidential election was stolen, *The Washington Post*, June 24, 2021,

*Smallen*, 950 F.3d at 1308; *In re Myriad Genetics, Inc.*, 2021 WL 977770, at *22.

## III.  Defendants' Omissions Regarding the Locked-Up Feature Violated Rule 10b-5(b)

Defendants' omissions regarding the Locked-Up Feature constitute deception for market manipulation, as discussed above, and are also independent violations of Rule 10b-5(b).  Defendants omitted from their discussion of the Digital Dividend in the July 30, 2019 10-Q, the July 30, 2019 10-Q, and the August 8, 2019 10-Q (¶¶282-292: JA4_954-957) that: (1) the Locked-Up Feature was a hoax and that they never intended to issue an unregistered Digital Dividend; (2) the Digital Dividend with the Locked-Up Feature was illegal; and (3) the true purpose of the Locked-Up Feature was to create an artificial price at which Defendant Byrne could profitably sell his common stock.  Defendant Byrne's August 22, 2019 statement about his departure also omitted his plan to take advantage of the artificial inflation created by the short squeeze to personally enrich himself.  ¶293; JA4_957.

---

https://www.washingtonpost.com/politics/2021/06/24/inside-shadow-reality-world-promoting-lie-that-presidential-election-was-stolen/

The District Court did not even consider whether these statements were actionable. *See Overstock*, 2021 WL 4267920, at *4. This was reversible error. *See supra* at Section II(A)(2); ¶¶282-293; JA4_954-957.

Similarly, the Order did not mention two other categories of actionable omissions. First, the July 30, 2019 Form 10-Q's risk disclosures stating that Dinosaur Financial "could encounter a variety of challenges in connection with the issuance of our Series A-1 Preferred Shares as a dividend" (¶286; JA4_955) misleadingly omitted that Defendants *knew* Dinosaur Financial could not broker the transfer of the Locked-Up Dividend at that time. A Dinosaur Financial representative stated that the announcement of the Locked-Up Dividend came "out of left field" so Dinosaur was unprepared to open accounts, and neither Dinosaur Financial nor Overstock could or would answer basic questions about the dividend. ¶¶114-115; JA4_902-903. Defendants thus knew or recklessly disregarded Dinosaur Financials' actual lack of preparation at the time of Defendants' purported risk warning. *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004).

Second, the challenged statements misled investors regarding Defendants' ability to obtain an ex-dividend date, a prerequisite to

issuing the dividend.  Overstock was required to "notify Nasdaq no later than ten calendar days prior to the record date of a cash or non-cash dividend distribution." NASDAQ Listing Rule 5250(e)(6); SEC Rule 10b-17.  Although Overstock did not cancel the Locked-Up Dividend until September 18, 2019 (within the ten-calendar day window), NASDAQ *never* issued an ex-dividend date (¶¶117 & n.9; JA4_903-904) – either because Defendants never requested an ex-dividend date from NASDAQ because they did not actually intend to issue the Locked-Up Dividend, or because NASDAQ refused to provide an ex-dividend date because the dividend needed to be registered first – a fact the District Court completely ignored.   Concealment of either of those highly material events is actionable.  *See Rombach*, 355 F.3d at 173; *Grossman*, 120 F.3d at 1125.

Lead Plaintiff also satisfied the reliance and scienter requirements for this claim for the same reasons discussed in Section II(B) and (C).

## IV.  Defendants' False and Misleading Statements Regarding the Retail Division Violated Rule 10b-5(b)

Appellant alleged Overstock misled investors regarding its Retail division by announcing increases to Retail Adjusted EBITDA that Defendants knew were false and misleading.  In granting Defendants'

motion to dismiss this claim, the District Court improperly decided factual disputes, applied the incorrect legal standard for assessing confidential witness's credibility, and ignored certain challenged statements and key allegations of falsity and scienter.

## A. Defendants Made False and Misleading Statements and Omissions Regarding Overstock's Retail Division

A statement is false or misleading "if a reasonable person would have understood it to be 'inconsistent with the facts on the ground.'" *Nakhumpun v. Taylor*, 782 F.3d 1142, 1148 (10th Cir. 2015). "[A]ny untrue statement of a material fact" is actionable, as are omissions of material fact "necessary . . . to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. §240.10b-5(b). At the pleading stage, allegations must be accepted as true and considered holistically. *In re Level 3 Commc'ns, Inc. Secs. Litig.*, 667 F.3d 1331, 1339 (10th Cir. 2012).

Lead Plaintiff challenged Defendants' false and misleading statements and omissions regarding Retail Adjusted EBITDA on May 9, 2019; July 15, 2019; August 8, 2019; and August 22, 2019. ¶205-209, 222, 224-228, 230; JA4_929-930, 934, 935-937.

| Date | Challenged Statement and Alleged Justification for Increase |
|---|---|
| May 9, 2019 | Increased from $10 million to $15 million because, *inter alia*, "**[o]ur search engine rankings have seen seven consecutive months of sequential improvements.**" |
| July 15, 2019 | Increased from $15 million to $17.5 million because "in June our ***SEO rankings on Google took another big step in recovery***" |
| August 8, 2019 | Reaffirmed $17.5 million |
| August 22, 2019 | Reaffirmed $17.5 million |

### 1. Search Engine Optimization Improvement Did Not Happen

Defendants' Retail Adjusted EBITDA statements were false and misleading because they never experienced material improvements to SEO, the primary justification for the dramatic increases announced on May 9, 2019 and July 15, 2019.  SEO refers to the likelihood that a consumer searching for a particular product will find their way to Overstock's website.  SEO is central to the Retail division's success. ¶¶202-203; JA4_928-929.

CW #2 explained there "was ***never*** a big improvement' in SEO, including no improvement during the first or second quarter of 2019." ¶85; JA4_893-894.  To experience such SEO improvement, Overstock would need to make major changes to its website, but nobody made ***any***

major changes to the website during the time Overstock claimed to have experienced a marked improvement in SEO. *Id.* Further, Defendant Iverson knew from personal conversations with CW #0 that "keyword ranking, as presented, was not a meaningful metric" justifying Retail Adjusted EBITDA increases. *Id.* Accordingly, improved keyword rankings did not cause improved revenue or contribution.

The District Court improperly disregarded these confidential witness allegations by applying an incorrect legal standard. At this stage, courts must "accept the truth of the witnesses' accounts as pleaded in the complaint and do not assess the witnesses' credibility." *Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1239 (10th Cir. 2016), as amended (July 6, 2016). The District Court rejected CW #0 because Lead Plaintiff did not specify a particular title or dates of employment. *Overstock*, 2021 WL 4267920 at *8.[14] But that is not required. *See In re Myriad Genetics*, 2021 WL 977770, at *18 (crediting confidential witness based on allegations of "specific incidents in which they participated",

---

[14] This was because CW #0 was extremely concerned about retaliation. To address any questions the District Court had about CW #0's role or basis for knowledge, Lead Plaintiff offered to provide an unredacted copy of CW #0's declaration to the District Court. *See* Dkt. No. 127 at 12 n.9; JA8_1679. The District Court ignored that offer.

including meetings with defendants); *In re Rhythms Sec. Litig.*, 300 F. Supp. 2d 1081, 1088-89 (D. Colo. 2004) (crediting sources described as an "operations consultant" or "employee who worked in the Operations Reporting Group," because they are "sufficiently specific to support the probability that the employees possessed the information alleged.").

The District Court also found Lead Plaintiff failed to provide CW #0's job description or allegations of his involvement in the Retail planning process. *Overstock*, 2021 WL 4267920 at *7. But that is incorrect. The Complaint alleges that CW #0 was a senior Overstock executive and a direct participant in the 2019 Retail planning process along with Defendants Nielsen, Iverson, and Byrne. ¶75; JA4_888-889. It also alleges CW #0 was personally "familiar with the monthly Outlook process which involved the monthly updating and reforecasting of financial numbers from the Plan based on recent performance and new information" (*id.*), as well as what the Individual Defendants knew regarding Retail performance and when they knew it.

Similarly, the District Court held the allegations regarding CW #2's role was "a stretch," despite Lead Plaintiff providing a job title, job description, and dates of employment – exactly what the District Court

54

held was lacking for CW #0. *Overstock*, 2021 WL 4267920, at *7, 9; ¶85; JA4_893-894. Further, the District Court found CW #2's allegations not credible due to what it deemed inadequate support for the basis of CW #2's knowledge. *Overstock*, 2021 WL 4267920, at *9. But this is error because CW #2's team was responsible for making changes to Overstock's website, and without website changes there could be no improvement to SEO.[15] ¶84; JA4_892-893.

In addition to improperly disregarding all confidential witness allegations, the District Court improperly found Defendants' statements were true because they provided investors with data regarding improved keyword search ranking. *Overstock*, 2021 WL 4267920, at *9. But there is no evidence that the data presented was accurate or meaningful, and Lead Plaintiff's well-supported contrary allegations that SEO did not improve should be credited at this stage.

---

[15] CW #2 and CW #1 both confirmed there was never an announcement of major SEO improvement during the routine multi-department "standups" where executives including Byrne provided updates. ¶85; JA4_893-894. *See Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 261 (3d Cir. 2009) (corroboration bolsters a CW's reliability).

### 2. There Was No Basis for Retail Adjusted EBITDA Increases

Additionally, Lead Plaintiff sufficiently demonstrated that the increases during the Class Period were false because the Company's *own CFO* found them unsupportable and impossible to meet. The Retail Adjusted EBITDA number was based on a formula that included "upside" from special projects to be implemented throughout the year. ¶75; JA4_888-889. Defendant Iverson determined that a realistic upside number was $5-$10 million. *Id*. Defendant Iverson felt strongly that the upside number of $20 million used by the Company instead unsupportable and impossible, but the Company used that number to calculate Retail Adjusted EBITDA. ¶¶75-77; JA4_888-890.

The District Court improperly disregarded these allegations of Defendants' actual knowledge of the falsity of their statements by finding that Lead Plaintiff failed to identify the specific meeting where the upside information was conveyed. *Overstock*, 2021 WL 4267920 at *8. But having alleged through personal knowledge that the information "was raised with [Overstock] executives", and that Defendant Iverson "acknowledged the lack of validation" for the information provided to investors and that "concerns" were conveyed to the Defendants "to no

56

avail," CW #0's allegations are more than sufficient.  *In re Myriad Genetics, Inc.*, 2021 WL 977770, at \*17-18 (crediting CW allegations where basis of knowledge was sufficiently identified).

The District Court committed another error by concluding the statements were nonactionable because Defendants did not know that Overstock could not reach the claimed numbers.  *Overstock*, 2021 WL 4267920 at \*8.  This directly contradicts the actual allegations, which are that Defendant Iverson "***knew*** the [\$20 million] number to be flat out wrong and misleading" and that Defendant Byrne knowingly forced the Company to use that "flat out wrong" number anyway.  ¶75; JA4_888-889.  The Complaint also specifically alleges that Defendant Nielsen had a report documenting that Overstock would not achieve the \$17.5 million Adjusted EBITDA number and failed to disclose that information to investors.  ¶79; JA4_890.

### 3.    The Magnitude and Timing of the Miss

On September 23, 2019 – just four-and-half weeks after Defendant Byrne reiterated the Retail Adjusted EBITDA of \$17.5 million – Overstock's new leadership announced a complete reversal, revising EBITDA downward to negative \$1.2 million – more than a 100% drop

57

within weeks. ¶¶177-78; JA4_922-923. The magnitude of this disjunction and the rapidity of the reversal are further evidence that Defendants knew their Retail Adjusted EBITDA numbers were false when announced. *See Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1106 (10th Cir. 2003), *as amended on denial of reh'g* (Aug. 29, 2003) (considering "the magnitude of the alleged falsity"); *Dudley v. Haub*, No. 2:11-CV-05196-WJM, 2013 WL 1845519, at *12 (D.N.J. Apr. 30, 2013) (rapidity of impairment is evidence of falsity). The District Court ignored these allegations.

### 4. The District Court Ignored the August 22, 2019 Statement

Approximately two weeks after the August 8 earnings call, a revised outlook was presented to Executive leadership, including Defendant Nielsen, that confirmed the $17.5M Retail Adjusted EBITDA number would not be achieved. ¶¶78-79; JA4_890. But, on August 22, 2019, Nielsen falsely reiterated that Retail Adjusted EBITDA would hit $17.5 million for the year on an earnings call. ¶¶132, 269-71, 274; JA4_908-909, 950-951, 952. The District Court found the August 22, 2019 statements to be non-actionable because it wrongly concluded that

the outlook was not reiterated that day. *Overstock*, 2021 WL 4267920 at *8. That error requires reversal.

## B.    Defendants' Retail Statements are Not Protected by the PSLRA Safe Harbor

The District Court held the Retail Adjusted EBITDA numbers were protected by the PSLRA's safe harbor because they were projections not made with actual knowledge that the statements were false or misleading. *Overstock*, 2021 WL 4267920 at *9. As described above, those findings ignore allegations that established actual knowledge that the statements were false and misleading when made. *Kapur v. USANA Health Scis., Inc.*, No. 2:07-cv-00177-DAK, 2008 WL 2901705, at *9 (D. Utah July 23, 2008) ("The safe harbor provision does not protect forward-looking statements that are made with 'actual knowledge' that the statement was untrue or misleading.").

Further, many of the statements are not forward-looking or projections at all, but rather were statements of historical or current fact. Defendants' August 8, 2019 and August 22, 2019 statements that the Retail division ***had already*** returned to positive adjusted EBITDA (¶¶268, 274; JA4_950, 952) and that SEO *already* improved through "repairing our rankings in natural search" and "7 consecutive months of

sequential month over month growth" (¶68; JA4_887); that "in June our SEO rankings on Google took another big step in recovery" (¶266; JA4_948-949); and the Company "made another significant breakthrough in the recovery of our SEO rankings" (¶125; JA4_906), are all statements of historical fact not protected by the safe harbor. *See Voulgaris v. Array Biopharma Inc.*, No. 17-cv-2789-KLM, 2020 WL 8367829, at *20 (D. Colo. Nov. 24, 2020) (no safe harbor when information rendering the statements false did "not depend on a future contingency").

Accordingly, Defendants' statements cannot be protected by the safe harbor.

## C.    Lead Plaintiff Satisfied the Reliance Requirement

Lead Plaintiff also adequately pled that it is entitled to a presumption of reliance under *Basic* for Defendants' false and misleading statements regarding the Retail fraud. *See* Section II(B)(2).

## D.    Defendants Acted with Scienter

The allegations in the Complaint, taken holistically together, sufficiently allege scienter. *Smallen*, 950 F.3d at 1306.

### 1.    Defendant Byrne's Insider Trading

Two trading days after the first quarter 2019 results including the inflated Retail guidance were announced, Defendant Byrne sold over

900,000 shares of Overstock common stock for $10.731 million, more than 15% of his stake in the Company's common stock. ¶¶88-90; JA4_895.  As discussed above, Section II(C)(2), the District Court's rejection of these facts as strong evidence of scienter was erroneous.

### 2.  Defendants' Actual Knowledge

As discussed above, Defendants had reports and took part in meetings that made clear that the Company's revenue guidance was unattainable and based on "flat wrong" numbers.  This "conflict between internal reports and public statements would be evidence of scienter." *Level 3 Commc'ns, Inc.,* 667 F.3d at 1345 (10th Cir. 2012); *see also In re Myriad Genetics*, 2021 WL 977770, at *16 (allegations that defendants had information that conflicted with their statements regarding revenue, sufficient to allege defendants' scienter).  The District Court disregarded these reports by, as discussed above, improperly holding that SEO had no bearing on the Retail fraud.

### 3.  Suspicious Timing of Defendant Iverson's Abrupt and Unexplained Departure

Defendant Iverson's abruptly left Overstock on September 17, 2019, immediately after Nielsen rejected the revised Outlook and just days before Overstock revealed its disastrous "near break-even" Retail

Adjusted EBITDA guidance.   ¶¶17, 81, 179; JA4_870-871, 891, 923.
Defendant Iverson left without notice or explanation.   *Id.*   A key
executive's departure timed when that executive had knowledge of the
fraud and it was about to be revealed is supportive of scienter for
Defendant Iverson and the other defendants.  *In re Myriad Genetics, Inc.*,
2021 WL 977770, at *22 (resignation unusual and supported scienter
when effective immediately and no successor named).

### 4.    Retail Sector's Critical Importance

Retail provided almost all of Overstock's revenue.   The Retail
sector's critical importance to Overstock supports an inference of fraud
under the core operations theory.  *See Jun Zhang v. LifeVantage Corp.*,
No. 2:16- cv-965-TS, 2017 WL 2599883, at *9 (D. Utah June 15, 2017)
(core operations theory supports scienter for senior executives when
alleged misconduct occurs in an operation important to a company's
bottom line).

### 5.    Magnitude of the Miss and Abrupt Reversal in Retail Adjusted EBITDA

The magnitude of the miss and the abrupt change from projected
$17.5 million to negative $2.2 million in just four-and-a-half weeks
supports not only that the Retail guidance was false from the start (as

discussed above), but also that the Retail Adjusted EBITDA statements were made with scienter. *Adams*, 340 F.3d at 1106 ("magnitude of the alleged falsity" strengthened inference of scienter). The District Court ignored this allegation.

### 6. False Justification for Reversal in Retail Adjusted EBITDA

Defendants' sloppy cover-up of the Retail fraud further supports a finding of scienter. The supposed reasons for the dramatic reversal in Retail Adjusted EBITDA were not credible and false. *See supra* at 20; ¶¶217-219; JA4_932-933. *See also In re Nature's Sunshine Prod. Sec. Litig.*, 486 F. Supp. 2d 1301, 1310 (D. Utah 2007) ("Evidence that a defendant has taken steps to cover-up a misdeed is strong proof of scienter.").

### 7. Ongoing SEC Investigation

Finally, the ongoing SEC investigation into Defendants Overstock and Byrne is another key allegation that the District Court ignored and provides strong evidence of scienter. ¶¶187-189, 196, 198; JA4_925, 927. *See Smallen*, 950 F.3d at 1308 ("governmental investigations into a company can contribute to an inference of scienter."). Just a day after the Defendants filed their motion to dismiss, Overstock announced the

SEC's investigation had expanded into the Retail fraud.[16]  The District

Court disregarded the SEC's investigation, wrongly concluding that it

does not bear on scienter.

### 8.  Factual Errors in the District Court's Analysis of Each Individual Defendant Require Reversal

As to Defendant Byrne, the District Court ignored his actual

knowledge that he was using inaccurate financial information and

improperly forgave his stock sales.  Finally, the District Court held

Defendant Byrne lacked scienter because it concluded the allegations do

not demonstrate that retail guidance was unattainable – a finding at

odds with the allegations in the Complaint.  *Overstock*, 2021 WL 4267920

at *13.

As to Defendant Iverson, the District Court held did he not make

any statements about retail guidance or SEO so could not be liable for

the Retail fraud.  *Overstock*, 2021 WL 4267920 at *12.  This overlooks the

internal controls statements that Defendant Iverson signed-off on and for

which he is liable, as well as the May 9, 2019 and August 8, 2019

---

[16] *See* Overstock, Form 10-Q of November 4, 2021 at 21, available at https://investors.overstock.com/static-files/9f1bd420-2c87-4258-bc62-c4fbb490bc80

statements for which he was present and failed to correct. ¶30; JA4_874; Defs. Mot. to Dismiss, Exs. L and M, JA7_1471, JA7_1488. *See Ga. Firefighters' Pension Fund v. Anadarko Petroleum Corp.*, 514 F. Supp. 3d 942, 956 (S.D. Tex. 2021) ("[A] high ranking company official cannot sit quietly at a conference with analysts, knowing that another official is making false statements and hope to escape liability for those statements."), *quoting Barrie v. Intervoice-Brite, Inc.*, 409 F.3d 653, 656 (5th Cir. 2005). It also ignores the key allegation that Defendant Iverson knew the Retail Adjusted EBITDA numbers were inaccurate and that Lead Plaintiff alleged that Defendant Nielsen was present for and failed to correct other Defendants' statements. ¶¶29-33; JA4_874-875; Defs. Mot. to Dismiss, Ex. M, JA7_1488.

## V.    Defendants are Liable Under Section 20(a)

Corporate officers can be held secondarily liable for the violations of the corporation and should be here for the reasons discussed above. *Adams,* 340 F.3d at 1108 (holding chairman and CFO control persons for purposes of 20(a) liability.).

## VI.    Defendant Byrne's Insider Sales Violated Rule 20A

The District Court erred in dismissing the Rule 20A insider trading claim due to the timing of the stock transactions at issue.

Rule 20A requires that the plaintiff's stock transactions and those of the defendant engaged in alleged insider trading occur "contemporaneously." 15 U.S.C.A. § 78t-1. This requirement ensures that only those "directly implicated by the insider trading . . . may seek direct redress." *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 662 (E.D. Va. 2000). Rule 20A does not define "contemporaneous," and there is no consensus among the federal courts on a definition. Various courts have found it satisfied by trades occurring anywhere from the same day, to less than a week apart, to within a month, to within "the entire period while relevant and nonpublic information remained undisclosed." *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 258 F. Supp. 2d 576, 599 (S.D. Tex. 2003); *see also In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 144 (S.D.N.Y. 1999) (within 5 days contemporaneous); *In re Cypress Semiconductor Sec. Litig.*, 836 F. Supp. 711, 714 (N.D. Cal. 1993) (same).

The District Court dismissed the 20A claims because Lead Plaintiff's stock purchases occurred three days before Defendant Byrne's stock sales. *In re Overstock Sec. Litig.*, WL 5775845, at \*14. The District Court relied on cases outside of the 10th Circuit which read into the

66

definition of "contemporaneity" a requirement that investors' purchases occur *after* the insider's sales. *See Alfus v. Pyramid Tech. Corp.,* 745 F. Supp. 1511, 1522 (N.D. Cal. 1990). This conflicts with the statute, which does not require a particular trading sequence. As one treatise explains, trading sequence is irrelevant because "the informational disadvantage is the same" whether the insider's trade comes first or last. 18 Donald C. Langevoort, *Insider Trading Regulation, Enforcement and Prevention*, § 9:3 (2020).

Lead Plaintiff purchased shares during a period of price inflation caused by Defendant Byrne's market manipulation; Defendant Byrne then sold his shares *at the resulting inflated prices*, benefitting from his insider knowledge that the Locked-Up Feature was a ruse and the Digital Dividend would never actually be issued in that format to sell before the inflation ended. Thus, Lead Plaintiff was the quintessential investor harmed by Defendant's insider trading. In contrast, an investor who purchased shares *after* Defendant Byrne sold his shares and the squeeze abated would not have been harmed. Thus, the District Court's requirement that the Defendant trade *before* the plaintiff gets the contemporaneity analysis backwards.

67

## Conclusion and Relief Sought

For the foregoing reasons, the judgment of dismissal should be reversed in its entirety.

Respectfully submitted this 28th day of January, 2022.

COHEN MILSTEIN SELLERS & TOLL PLLC

By: */s/ Michael B. Eisenkraft*

Michael B. Eisenkraft
Laura H. Posner
88 Pine Street, 14th Floor
New York, New York 10005
Telephone: 212-838-7797
Facsimile: 212-838-7745
meisenkraft@cohenmilstein.com
lposner@cohenmilstein.com

Daniel H. Silverman (pro hac vice)
Molly J. Bowen (pro hac vice)
Joshua Handelsman (pro hac vice)
1100 New York Avenue NW, Suite 500
Washington, DC 20005
Telephone: 202-408-4600
Facsimile: 202-408-4699
dsilverman@cohenmilstein.com
mbowen@cohenmilstein.com
jhandelsman@cohenmilstein.com

CLYDE SNOW & SESSIONS

Keith M. Woodwell
Katherine E. Pepin
201 South Main Street, Suite 1300
Salt Lake City, Utah 84111
Telephone: 801-322-2516
Facsimile: 801-521-6280
kmw@clydesnow.com
kep@clydesnow.com

*Attorneys for Lead Plaintiff-Appellant*

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is requested. Lead Plaintiff-Appellant believes that oral argument is appropriate in this case as it will likely assist the Court in this complex securities action with numerous and highly nuanced issues. Given the Court's *de novo* review of the complaint, oral argument will allow the parties to address the Court's questions that arise from the briefing and assist the Court in resolving this appeal.

## Certificate of Compliance

1.    This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,875 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because the brief – in both its text and its footnotes – has been prepared in 14-point Century Schoolbook font.

I declare under penalty of perjury that the foregoing is true and correct.

*/s/ Michael B. Eisenkraft*
Michael B. Eisenkraft

# ADDENDUM

# TABLE OF CONTENTS

## [ADDENDUM]

Memorandum Decision and Order,
    Filed September 20, 2021 [Docket No. 137] ...........................ADD-1

Judgment in a Civil Case,
    Filed September 20, 2021 [Docket No. 138] .........................ADD-33

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| IN RE OVERSTOCK SECURITIES LITIGATION | **MEMORANDUM DECISION AND ORDER** |
| THE MANGROVE PARTNERS MASTER FUND, LTD., | **Case No. 2:19-CV-709-DAK-DAO** |
| Lead Plaintiff, | **Judge Dale A. Kimball** |
| v. | **Magistrate Judge Daphne A. Oberg** |
| OVERSTOCK .COM, INC., PATRICK M. BYRNE, GREGORY J. IVERSON, and DAVID J. NIELSEN, | |
| Defendants. | |

This matter is before the court on Defendants Overstock.com, Inc., Gregory J. Iverson, and David J. Nielsen's ("Overstock Defendants") Motion to Dismiss Plaintiff's Amended Consolidated Complaint [ECF No. 125], and Defendant Patrick M. Byrne's Motion to Dismiss Plaintiff's Amended Consolidated Complaint [ECF No. 124]. On June 18, 2021, the court held a hearing on the motions by Zoom video conferencing because of the Covid-19 pandemic. Michael B. Eisenkraft, Laura H. Posner, Daniel H. Silverman, Molly J. Bowen, Joseph D. Watkins, and Keith M. Woodwell represented Plaintiff. John C. Dwyer, Jessica Valenzuela Santamaria, Jeffrey D. Lombard, and Erik A. Christiansen represented the Overstock Defendants. Robert N. Driscoll, Alfred D. Carry, Holly Stein Sollod, and Cory A. Talbot represented Defendant Patrick M. Byrne. Having fully considered the parties' written submissions, oral arguments, and the law and facts

ADD-1

related to the motion, the court enters the following Memorandum Decision and Order.

## BACKGROUND

This is the second round of motions to dismiss in a securities fraud class action brought by Lead Plaintiff, The Mangrove Partners Master Fund, Ltd., on behalf of persons who purchased Overstock common stock between May 9, 2019, and November 12, 2019. Plaintiff alleges that Defendants made false statements about Overstock's financial projections for 2019 and engineered a scheme to issue a digital dividend that purportedly caused an artificial squeeze on short sellers. The court dismissed the claims in a previous decision, but allowed Plaintiff to amend its Consolidated Complaint based on new evidence.

### A. Initial Allegations

As explained in the court's prior decision, Overstock is an online retailer of home goods. In 2014, Overstock began working on initiatives to develop blockchain technologies, which it now pursues through its wholly-owned subsidiary Medici Ventures, Inc. Medici conducts the majority of its business through a subsidiary, tZERO Group, Inc., which is focused on developing and supporting the issuance of digital securities. Through tZERO, Overstock sought to create an alternative trading platform where the investing public could purchase and trade digital securities. However, during the class period, Overstock's retail business generated nearly all of its revenues.

Dr. Patrick Byrne is the founder and former CEO and director of Overstock. He resigned from Overstock on August 22, 2019, during the middle of the class period. Gregory J. Iverson is Overstock's former CFO. He resigned from Overstock on September 17, 2019, during the class period. David J. Nielsen became Overstock's retail division President on May, 9, 2019, the beginning of the class period, and served in that role throughout the class period.

Lead Plaintiff, The Mangrove Partners, is an institutional investor that purchased Overstock common stock during the class period. Plaintiff is a well-known short seller, and Dr. Byrne publicly denounced short sellers for artificially depressing Overstock's share price. Short sellers borrow stock from a brokerage (and pay interest while the shares are outstanding), sell those borrowed shares at a time they believe the company's market price is high, purchase shares back when they believe the stock price is low, and return those newly purchased shares to the brokerage. If their prediction is right, they make a profit. If their prediction is wrong and the stock price rises, they incur a loss. If a dividend is issued on stock a short seller has borrowed, the short seller has a contractual obligation to pay that dividend to the lender. If the short seller cannot pay the dividend, the only way to avoid breaching its contractual obligations is to "close out" or "cover" its short position by purchasing the shorted stock on the open market.

Before the start of the class period at issue in this case, Plaintiff shorted more than 2.5 million Overstock shares. Plaintiff continued shorting Overstock shares throughout the class period. In fact, Plaintiff's only purchases during the class period were pursuant to preexisting contractual obligations owed to lenders whose stock Plaintiff had previously borrowed to sell short.

During the period leading up to the class period, Overstock's retail division had been struggling to regain market share from its main competitor, Wayfair. In early 2018, it cut prices and increased advertising spending, but its efforts to regain market share failed. In the second half of 2018, Overstock reversed course and began focusing on value and running the company profitably by decreasing customer acquisition costs and increasing customer retention.

Two months before the start of the class period, on March 18, 2019, Overstock held its earnings call and disclosed, among other things, that the retail division ended the fourth quarter of 2018 with a $16.9 million "Adjusted EBITDA" loss. Adjusted EBITDA is a non-GAAP financial

3

measure that approximates cash flow.  However, Overstock also announced that it expected the

retail division to be profitable in 2019 and provided full year 2019 guidance for Retail Adjusted

EBITDA of $10 million.

Overstock explained that the positive guidance was due to a number of factors: (1) retail

contribution was $33 million in the fourth quarter of 2018 and was expected to increase to $37

million in the first quarter of 2019; (2) customer retention was up 36% year-over-year; (3)

Overstock had already cut 25% of its general and administrative expenses; and (4) after 16 months

of search optimization deterioration, Overstock posted six consecutive months of ranking

improvements.  Plaintiff does not allege that any of these statements are false or misleading.

On May 9, 2009, the first day of the class period, Overstock reported results for the first

quarter of 2019.  The Retail Adjusted EBITDA improved $14.4 million from the prior quarter,

ending with a loss of  $2.5 million.  Overstock attributed the retail division's improved performance

to its continued focus on contribution, expense structure optimization, and improvements in search

engine rankings.  Based on that performance, and its estimate that contribution from the retail

division would increase from the original estimate of between $160-185 million, Overstock raised

its full-year Adjusted EBITDA retail guidance by the same amount, $5 million.  The revision of the

retail guidance is the first allegedly false statement identified in the Consolidated Complaint.

On July 15, 2019, in a Form 8-K filed with the SEC, Overstock disclosed that, based on

favorable second quarter results, it was raising retail guidance again by $2.5 million.

On August 8, 2019, Overstock reported its second quarter results.  As projected the retail

division returned to profitability, generating a positive $1.6 million in Adjusted EBITDA.  This was

the first time since the second quarter of 2017 that the retail division had posted a positive Adjusted

EBITDA.  Because the second quarter of the year is traditionally Overstock's softest quarter of the

4

ADD-4

year, Overstock reconfirmed the retail guidance it provided in July.  Overstock also disclosed that its

general and administrative expenses in the second quarter of 2019 were higher than the second

quarter of 2018, in part, due to a $722,000 increase in corporate insurance costs.

Plaintiff alleges that Overstock failed to announce that Overstock could not obtain insurance

coverage going forward for Byrne or any of its other officers or directors due to Byrne's increasingly

erratic behavior.  Plaintiff asserts that both Byrne and Iverson knew this.

On September 23, 2019, as its third quarter was nearing a close, Overstock issued a press

release disclosing that the retail division's third quarter results were expected to approximately

"break even."  Because the full year guidance previously "envisioned significant positive EBITDA

for Q3," which did not materialize, Overstock stated that it would be updating the full-year guidance

after the end of the third quarter.  Overstock identified five factors that would drive the company's

revised retail guidance: increased tariffs, increased freight costs, increased D&O insurance

premiums, waning consumer confidence, and slower conversion of search traffic.  Overstock also

revealed that Defendant Iverson had resigned on September 17, 2020, with no notice and effective

immediately.  Following the September 23 press release, Overstock's stock dropped by

approximately 25%.

With respect to Plaintiff's other claim, on July 30, 2019, Overstock announced that it would

issue a dividend of one share of Digital Voting Series A-1 Preferred Stock for every 10 shares of

common or preferred stock outstanding.  The record date for the Dividend would be September 23,

2019, and the distribution date would be November 15, 2019.  Overstock explained that the

Dividend would not be, and was not required to be, registered under the Securities Act of 1933.

Consequently, the Dividend could not be traded until the shares became eligible for resale under

Rule 14 of the Securities Act, approximately 6 months after issuance.

ADD-5

Once eligible for resale, the shares would be traded through a brokerage account established with Dinosaur Financial Group LLC ("Dino") on PRO Securities ATS, a SEC-registered alternative trading system operated by PRO Securities, a tZERO subsidiary. The estimated 40,000 Overstock stockholders on the Dividend record date would be issued approximately 3.7 million Series A-1 Preferred shares to trade on the tZERO platform.

Although Overstock stated that the Dividend was important for adoption of the tZERO platform and to bring broker-dealers into the broader tZERO ecosystem, Plaintiff claims that Overstock's stated goal was pretextual. Plaintiff contends that the dividend was announced shortly after Dr. Byrne learned that his relationship with a Russian spy was about to become public and he might need to leave the company. Plaintiff believes that the dividend's short squeeze was intended to increase the price of Overstock shares at the time of Dr. Byrne's departure.

Within hours of its announcement, several market-focused publications recognized the practical effect of the Dividend on short sellers. RealMoney published an article that same day stating, "Simply put: the digital shares are locked-up. They can't be sold for a period of time to be determined, but likely six months. There's the rub. If the digital shares can't be sold, how can they be sold short? Logic tells me they can't." The article then described the Dividend as having the potential to influence Overstock's stock price as "an artificial short-squeeze" because Overstock was "essentially telling shorts they need to buy shares on the NASDAQ to either avoid paying out the digital dividend or as a hedge after they've paid the digital dividend." Two days later, Bloomberg published an opinion article stating that the Dividend "punishes actual short sellers of Overstock's regular stock right now . . . by adding technical difficulties to maintaining the short." Similar commentary continued for months.

Plaintiff asserts that Overstock failed to prepare the necessary infrastructure for the

6

ADD-6

dividend's issuance.  Plaintiff claims that this failure indicates that Overstock never intended for the dividend to be issued in the manner disclosed to investors.  A representative from Dinosaur Financial stated that the dividend came out of left field without sufficient information or preparation.

On August 22, 2019, Byrne resigned from Overstock and left the country.  Less than three weeks later, the squeeze began to abate as some brokerages agreed to accept cash in place of the dividend and alleviated the short sellers' need to cover their positions.  Between September 16 and 18, 2019, Byrne sold his entire remaining common stock in Overstock, selling over 4.7 million shares for $90 million.  From abroad, Byrne admitted that he sold his remaining common stock after waiting for volume to pick up and stated that he invested the proceeds of his sales in precious metals and crypto-currencies to protect it from retaliation from the "Deep State.".

On September 18, 2019, Overstock officially ended the short squeeze by announcing in a Form 8-K filed that same day that the dividend's record date would be postponed and that restrictions would be loosened so that the dividend would be freely tradeable immediately.  This announcement alleviated short sellers' need to purchase to cover.  Plaintiff alleges that this shows that the lock-up feature of the dividend was a manipulative contrivance rather than a legitimate business maneuver.

The SEC launched an investigation into Overstock's and its officers' activities.  On October 7, 2019, the SEC subpoenaed documents relating to the dividend, potential insider trading by Overstock's officers, and communications with Byrne.  In December 2019, the SEC issued subpoenas relating to tZERO, insider trading policies, and employment and consulting agreements.

Lead Plaintiff's Amended Consolidated Complaint ("AC") continues to assert claims under Sections 10(b), 20(a), and 20A of the Exchange Act.  Count 1 alleges that all Defendants violated

7

ADD-7

Section 10(b) of the Exchange Act and Rule 10b-5(b), promulgated thereunder, by making false and misleading statements in May, July, and August 2019.  Count 2 alleges a claim for market manipulation under Section 10(b) and Rules 10b-5(a) and (c) against Overstock, Byrne, and Iverson. Count 3 alleges that the Individual Defendants are "controlling persons" under Section 20(a) of the Exchange Act.  Count 4 alleges an insider trading claim against Defendant Byrne under Section 20A of the Exchange Act.

Essentially, Plaintiff contends that Defendants engaged in a scheme to issue a locked-up dividend they knew would cause a short squeeze, artificially spike Overstock's stock price, and force short sellers of Overstock stock to cover their positions at inflated prices.  According to Plaintiff, Defendants compounded this fraud by overstating Overstock's annual retail guidance–misleadingly bolstering investor confidence in its retail segment–and by concealing Overstock's inability to obtain D & O insurance.  Moreover, Byrne allegedly took advantage of the artificially high stock price to sell his stake of Overstock common stock for $100 million in profits.

### B.  New Allegations

Plaintiff's Amended Consolidated Complaint ("AC") includes allegations from a new confidential witness, CW#0, who is described as a senior-level executive who participated in the 2019 planning process with the individual Defendants.  Plaintiff does not provide CW#0's job title, job description, or dates of employment though.  CW#0 claims that Overstock's base 2019 Plan was misleading because it was not the lower, conservative end of the guidance range, which was set in consultation with a team of consultants from Bain & Company.  That range was $145 to $165 million.  Overstock's final plan was set at $160 million, which corresponded to a $10 million adjusted EBITDA Retail guidance.  The final plan and retail guidance was set two months before the class period began.  CW#0 claims that about two weeks after Overstock reaffirmed the adjusted

8

ADD-8

EBITDA Retail guidance on August 8, 2019, a revised outlook was presented to the executive

leadership that purportedly made clear that the retail adjusted EBITDA would not be achieved.  A

few weeks later, on September 23, 2019, Overstock issued its "corrective disclosure" regarding the

expected disappointing third quarter results.  CW#0 also claims that Overstock's search engine

optimization improvements were "largely disconnected from improvements in revenue and

contribution."

In addition, Plaintiff's AC provides job descriptions for the two prior confidential witnesses

that were not in the precious complaint.  CW#1 was a "production design lead," whose job

responsibilities were to "work with retail partners who purchased advertisement space from

Overstock to design and build promotions" and "ensure the accuracy of the promotions and oversee

their execution."  The AC corrects CW#1's dates of employment with Overstock.  CW#1 left

Overstock in January 2019, four months before the beginning of the class period.  The prior

complaint had stated that CW#1 was employed at Overstock until 2020.

Plaintiff also adds allegations in the AC identifying CW#2 as a "front-end developer," who

was responsible for developing code for Overstock's retail homepage website and ensuring that

content designed by Overstock's creative teams appeared correctly on the website.  CW#2 worked

on the team responsible for the technical side of Overstock's website and implemented measures to

measure and improve the website's search engine optimization.  CW#2 stated that there was never a

big improvement in SEO and Overstock's website was not updated.  CW#2 left Overstock in July

2019, in the middle of the Class Period.

Plaintiff's AC also includes additional allegations about Byrne's alleged vendetta against

short sellers.  The AC also alleges, based on Byrne's statements and Overstock's actions after his

departure, that the locked up feature of the digital dividend had no business purpose, was illegal,

9

ADD-9

and implemented for the sole, undisclosed purpose of creating a short squeeze that would harm

short sellers and allow Byrne to liquidate his Overstock common shares at artificially high prices.

## DISCUSSION

### Defendants' Motions to Dismiss Plaintiff's Amended Consolidated Complaint

The Overstock Defendants and Defendant Byrne move to dismiss Plaintiff's AC, asserting

that the AC fails to state plausible claims under the heightened standard applicable to securities

fraud claims.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to state a claim for relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009).  A claim for fraud must "state with particularity the circumstances constituting

fraud or mistake."  Fed. R. Civ. P. 9(b).  In the securities fraud context, however, the pleading

standard "is more strict than that of Rule 9(b)."  *In re Qwest Communications, Int'l, Inc.*, 396 F.

Supp.2d 1178, 1188 (D. Colo. 2004) (citing *City of Phila. v. Fleming Cos., Inc.*, 264 F.3d 1245,

1258 (10th Cir. 2001)).  A securities fraud case has the "most stringent pleading requirement in

American civil law."  *McCauley v. City of Chi*, 671 F.3d 611, 625 (7th Cir. 2011) (citing *Tellabs,

Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007)).

Securities fraud claims are subject to the Private Securities Litigation Reform Act of 1995

("PSLRA"), which requires a plaintiff "to state with particularity both the facts constituting the

alleged violation, and the facts evidencing scienter."  *Kessman v. Myriad Genetics, Inc.*, 2019 WL

1330363, at *3 (D. Utah March 25, 2019).  The PSLRA imposes a heightened pleading requirement

for alleging the intent to defraud–or scienter– with particularized facts that give rise to an inference

that is at least as cogent as any competing, nonculpable explanations for a defendant's conduct.

*Tellabs*, 551 U.S. at 314.  The inference of scienter "must be more than reasonable or

10

ADD-10

permissible–it must be cogent and compelling." *Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1236-37 (10th Cir. 2016).

**A. Section 10(b) Claims**

Counts 1 and 2 of Plaintiff's Amended Consolidated Complaint allege violations of Section 10(b) of the Exchange Act. To state claims under Section 10(b), Plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Sci-Atlanta*, 552 U.S. 148, 157 (208). "Rule 10b-5 encompasses only conduct already prohibited by § 10(b)." *Id.*

**1. Count 1**

Defendants contend that Plaintiff fails to plead that any Defendant made a false or misleading statement about Overstock's historical insurance costs, the Dividend, or its Retail Guidance or SEO results. The AC alleges nothing new regarding the insurance and dividend statements. Because Plaintiff does not attempt to amend those allegations, and the court already found them to be inadequate, those claims are dismissed.

As to Retail Guidance and SEO, Plaintiff asserts that:

- In a May 9, 2019 shareholder letter, Byrne surprised investors by reporting good news about Retail adjusted EBITDA guidance. He raised guidance from $10 million to $15 million based on reduced expenses and increased search engine rankings based on seven months of sequential improvements. On a shareholder call that same day, Byrne stated that given "what's going on in retail, I've changed my expectations today . . . to expect this to go from $10 million to $15 million of operating – of

11

ADD-11

adjusted EBITDA."

- CW#0, who was involved in the Retail guidance planning process with the individual Defendants, and CW#2, who was responsible for implementing search engine improvements to the website, claim that the individual Defendants knew at that time that Overstock would not obtain $15 million in retail adjusted EBITDA and that the SEO improvement statements were illusory when made. According to CW#0, Byrne intentionally ignored the realistic upside numbers that Iverson determined were accurate and instead forced Overstock to use a higher upside number to land on the $15 million retail adjusted EBITDA. Iverson allegedly knew that this upside number and subsequent $15 million revenue guidance were "flat out wrong and misleading." However, Iverson stood by silently as Byrne presented to investors guidance numbers premised on his higher projections. Iverson and Byrne then signed Overstock's Form 10-Q that went out that day certifying that internal controls provided reasonable assurance regarding the reliability of financial reporting. This falsely inflated guidance was not removed from subsequent guidance announcements during the Class Period.

- On July 15, 2019, Overstock and Byrne issued a letter to shareholders announcing another increase in retail adjusted EBITDA guidance, this time from $15 million to $17.5 million. In the letter, Byrne also knowingly falsely claimed that the Retail division's contribution was covering its expenses, that the core earning power of the retail business had snapped back more quickly than expected, and that retail's recovery in 2019 had exceeded expectations. Defendant Iverson knew that these statements were false because it started from an improper baseline guidance.

12

ADD-12

- On August 8, 2019, in a shareholder letter, Byrne reaffirmed the retail adjusted EBITDA at $17.5 million, stated that the retail business had returned to positive adjusted EBITDA for the first time since the second quarter of 2017, and claimed that the company had experienced significant progress in SEO.  During an earnings call that same day, attended by Byrne, Iverson, and Nielsen, these false statements were reiterated.  According to CW#2, who was with the company through July 2019, Defendants knew there was never a big improvement in SEO that could justify these increases.

- Approximately two weeks after the August 8 earnings call, CW#0 confirmed that a revised revenue Outlook was presented to executive leadership that made clear that the $17.5 million retail adjusted EBITDA would not be achieved.  Nielsen knew that even this report was overly optimistic.  Nielsen had previously instructed the team responsible for the report to "beat up the numbers" and find "wins."  Nielsen also tried to pressure a group within the company to add $7 million to their projections. Instead of disclosing the reality that the EBITDA projections could never be met, Nielsen did nothing.

- On August 22, 2019, in a letter filed with a Form 8-K and sent to investors, Byrne falsely told investors that the retail business had recovered to a state of positive adjusted EBITDA.  On an earnings call the same day, Nielsen went further and falsely reiterated that retail adjusted EBITDA was already positive and would hit $17.5 million for the year.  Byrne and Iverson participated in the earnings call.

Plaintiff alleges that these facts are sufficient to survive a motion to dismiss with respect to its claims relating to Overstock's Retail Guidance and SEO statements.

13

ADD-13

### a. Retail Guidance

Defendants argue that the new allegations in the AC regarding Retail Guidance are insufficient to plead a false or misleading statement under the heightened standards of the PSLRA. Plaintiff must "specify each fraudulent statement, explain why the statement was misleading, and allege with particularity [its] basis for believing that the statement was false." *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1147 (10th Cir. 2015).

Plaintiff challenges the retail division EBITDA guidance Overstock provided on May 9, July 15, and August 8, 2019. Such guidance, however, is the quintessential example of a forward-looking statement protected by the PSLRA's safe harbor. *Caprin v. Simon Transp. Servs.*, 112 F. Supp. 2d 1251, 1257-58 (D. Utah 2000). To receive protection under the PSLRA's safe harbor, statements "must either (1) be identified as forward-looking and be accompanied by meaningful cautionary language; (2) be immaterial; or (3) not be made with actual knowledge that the statement was false or misleading." *In re Sun Healthcare Grp., Inc. Sec. Litig.*, 181 F. Supp. 2d 1283, 1288 (D.N.M. 2002).

The PSLRA safe harbor defines a "forward-looking statement" as "a projection of financial items, a description of management's plans and objectives for future operations or economic performance, or the stated assumptions underlying these projections." 15 U.S.C. § 78u-5(I). In the AC, there are no new allegations to refute the fact that the Retail Guidance was identified as forward looking, was accompanied by meaningful cautionary language, and the cautionary language referred to the exact problems that ended up occurring. And in its briefing on this motion, Plaintiff does not dispute that the guidance was forward-looking and accompanied by meaningful cautionary language.

To claim that the Retail Guidance statements were misrepresentations, Plaintiff relies on

14

ADD-14

allegations attributed to confidential witnesses and Overstock's reversal of Retail Guidance in September 2019. The "actual knowledge" standard for forward-looking statements is more exacting than the scienter inquiry required for statements of past or present fact. *In re Gold Res. Corp. Sec. Litig.*, 957 F. Supp. 2d 1284, 1297-98 (D. Colo. 2013). Plaintiff cannot simply state that a defendant was reckless. *Id.*

The AC adds allegations from a new confidential witness, CW#0, reflecting his belief that Overstock's retail guidance provided before the class period should have been at the lower end of the projected range instead of the higher end of the range. CW#0 is described as "an executive [who] participated in the 2019 planning process." The AC provides no title, no dates of employment, no job description, and nothing regarding the dates or manner in which CW#0 allegedly participated in the planning process. CW#0 claims that Byrne presented retail guidance on March 18, 2019, two months before the class period, that Iverson believed was allegedly flat out wrong and misleading. The AC, however, does not challenge the March 2019 guidance.

The new allegations attributed to CW#0 do not remove the retail guidance claim from the protection of the PSLRA's safe harbor provision. Nothing attributed to CW#0 suggests that any Defendant gave guidance that he knew was impossible for Overstock to meet. The allegations show a process to identify a range of future projections aided by external consultants from Bain & Company. While there is no blanket immunization for reliance on outside consultants in determining future projections, the allegations demonstrate that Overstock engaged in a process that provided it with a potential range of projections. There is no reason to believe that every executive at a company will agree with the range or where the company will fall within that range. Those differences of opinion are inescapable when dealing with future projections. The fact that a single unidentified "executive," such as CW#0, apparently disagrees with the decisions reached by

15

ADD-15

Defendants does not render Overstock's publicly-disclosed guidance false or misleading. Moreover, given the lack of allegations regarding his expertise in determining retail guidance, the allegations attributed to CW#0 lack the specificity and other indicia of reliability that the law requires.

Even if the court were to credit CW#0's allegations, they fail to demonstrate that any Defendant knew that the challenged guidance was unattainable. The allegations attributed to CW#0 are either irrelevant to the challenged guidance or merely another form of pleading fraud by hindsight. The majority of the allegations attributed to CW#0 relate to the initial 2019 Retail Guidance provided in March 2019, which Plaintiff does not allege was false or misleading and which was provided two months before the class period. CW#0's opinions appear to be based on the belief that Overstock considered a base plan between $145-$165 million, but did not select the lower or more conservative end of that range. But, importantly, CW#0 does not dispute the range and the figures Overstock chose were within the range. The AC alleges that the base plan for 2019, which was established before the class period began and reflected a projected retail contribution of $160 million, was unrealistic and misleading because it was not based at the lower, conservative end of the $145-165 million range. Plaintiff has not cited any authority suggesting that it is fraudulent for a company to set guidance at a particular point within a reasonable range of its own forecasts. And the court is not aware of any requirement that a company must base its public guidance on the lowest point within a reasonable range of its own internal forecasts. The fact that executives disagree as to the appropriate specific point within a determined range does not demonstrate fraud or an intent to defraud, only an internal disagreement. These allegations do not meet the requirement of showing that any Defendant believed or had actual knowledge that it was impossible for Overstock to meet its guidance.

Plaintiff focuses almost exclusively on the "upside" component of the initial contribution

16

ADD-16

guidance that Byrne announced on March 18, 2019. This argument is irrelevant to whether any Defendant knew the guidance provided during the class period was unattainable. Byrne's statement pre-dates the class period and is not alleged to be false or misleading. The AC concedes that the upside was not factored into the initial $10 million adjusted EBITDA guidance.

Plaintiff also appears to claim that Iverson said that the $10 to $20 million upside was "flat out wrong and misleading," but the AC does not attribute this statement to Iverson or CW#0. It appears to be Plaintiff's own characterization. The AC contains no allegations establishing how CW#0 would know anything about Iverson's purported opinion. It does not identify any meeting or conversation where Iverson expressed an opinion. It also fails to state how CW#0 was privy to any such communication or if any such communication was shared with Byrne or Nielsen.

CW#0 also asserts that many months after this initial guidance, in late August 2019, a "revised Outlook" was presented to executive leadership that supposedly made clear that the $17.5 retail adjusted EBITDA number would not be achieved. But this is after all challenged guidance statements were made and just a few weeks before Overstock disclosed disappointing third quarter results. Plaintiff argues that on August 22, two weeks after the August 8 earnings call, an internal projected outlook was generated that made clear the company's performance would likely fall short of the $17.5 million adjusted EBITDA guidance. Plaintiff argues that, despite this information, the company reiterated the same guidance on an earnings call that same day. But paragraphs 269 and 271 of the AC make clear that the reaffirmation of guidance was made on August 8, before the revised Outlook was allegedly presented. These allegations add nothing to Plaintiff's fraud claims and appear to be another attempt at pleading fraud by hindsight. None of these allegations plead that any Defendant had actual knowledge that it was not possible to meet the Retail Guidance provided at the time that the guidance was provided.

17

ADD-17

The court concludes that Plaintiff's new allegations fail to provide any basis for changing the court's prior analysis that the Retail Guidance is protected by the PSLRA safe harbor for forward-looking statements. The AC, therefore, fails to demonstrate that any of the Defendants made a knowingly false claim regarding retail guidance. Retail guidance within a range estimated by the company and an outside consultant is not evidence of fraud or an attempt to mislead investors. Picking the high end of the range rather than the low end of the range does not make the guidance fraudulent or misleading. And, Overstock provided cautionary language outlining the same risks that the company ultimately attributed to the guidance miss. Such conduct does not remove this case from the PSLRA's safe harbor provisions for forward-looking statements. The fact that Overstock ultimately missed its guidance does not demonstrate that any Defendant knew it was unattainable. And claiming that Overstock's failure to meet the guidance is evidence of fraud is a classic example of fraud-by-hindsight pleading. Congress designed the safe harbor provisions of the PSLRA to protect companies from these types of challenges. The AC also fails to adequately allege that any Defendant had adequate knowledge of any falsity. Accordingly, the court dismisses Plaintiff's retail guidance claim.

### b. SEO

Defendants argue that the AC also fails to adequately allege that the statements regarding SEO (search engine optimization) were false or misleading when made. Plaintiff challenges two statements by Byrne about SEO performance. On May 9, 2019, Byrne stated that search engine rankings had seen seven months of sequential improvements. And, on July 15, 2019, Byrne stated that in June, the SEO rankings on Google took another big step in recovery. Plaintiff claims that these statements were false or misleading because SEO purportedly was not improving.

Plaintiff's allegations with respect to SEO rely heavily on information from confidential

18

ADD-18

witnesses.  But the AC fails to allege what CW#0 and CW#2 believed to be the correct SEO

numbers and whether either CW believed that the SEO metrics presented in the slides

accompanying Overstock's earnings calls during the class period were inaccurate in any way.

Absent such a charge, this specific data undercuts the more generalized allegations of the

confidential witnesses.

Plaintiff's argument that CW#2's allegations are relevant and reliable because his or her job

purportedly involved "implementing tags and analytics" on Overstock's website is a stretch.  There

are no details about whether CW#2 was responsible for reviewing, or even aware of, the data that

would show whether SEO was improving.  CW#2 alleges that there were no SEO improvements

during the first half of 2019 but provides no details about any specific information relied upon to

reach that conclusion.  Nor can this be reconciled with CW#0's admission that keyword search

rankings did improve.  Thus CW#2's allegations are so vague as to be essentially meaningless as a

basis for a fraud claim.  Nothing attributed to either witness actually contradicts the two challenged

statements.  Plaintiff still does not challenge the accuracy of the underlying SEO data disclosed on

the May 9 and August 8 earnings calls.  This specific data undercuts the more generalized

allegations of the CWs.  And, regardless of whether SEO was improving, Overstock did not increase

its retail guidance based on improvements in SEO.  Instead, as the AC alleges, Overstock raised

both contribution and adjusted EBITDA guidance based on undisputed increases to contribution in

prior periods, combined with undisputed reductions to expenses.

Plaintiff asserts a new theory as to SEO in the AC.  CW#2 claims that while search engine

rankings may have improved for particular keywords, this is irrelevant because what really matters

for revenue is conversion.  Defendants, however, point out that this misses the mark because Byrne

did not claim that improved SEO resulted in increased revenue.  Rather, he stated it helped increase

19

contribution. The AC does not allege that improved SEO cannot lead to increased contribution by reducing sales and marketing expenses, which Plaintiff cannot dispute happened. As such, the AC fails to allege that Byrne's statements were inconsistent with the actual facts the company was facing at the time. *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1148 (10th Cir. 2015).

According to CW#0–who is not alleged to have experience with, or expertise regarding, SEO or accounting–the improvements in SEO were not a meaningful metric because they were largely disconnected from, did not equate to meaningful improvement in, and did not meaningfully drive increased revenue and contribution. But the AC fails to provide any specifics on what CW#0 considers meaningful. CW#0's allegations suggest that there was some increase and improvement in revenue and contribution. That contradicts the allegations of CW#2, who claims that there was no improvement. These contradictory claims do not support an allegation of fraud. Therefore, the court concludes that Plaintiff still fails to plead that Byrne's statements about SEO were false or misleading. The AC contains no well-pled facts that are inconsistent with Byrne's statements regarding SEO. Accordingly, the court dismisses Plaintiff's SEO misrepresentation claims.

### 2. Count 2

In Count 2, Plaintiff alleges that Defendants' digital dividend manipulated the market in violation of Rules 10b-5(a) and (c). Defendants, however, argue that Plaintiff fails to plead a manipulative scheme claim because there are no well-pled facts demonstrating that the market was deceived by Defendants' digital dividend.

As the court previously recognized, a wide range of conduct can be manipulative. *Lorenzo v. SEC*, 139 S. Ct. 1094, 1101 (2019). Conduct is manipulative when it artificially alters the market for a security: "manipulative . . . connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *Ernst & Ernst v.*

20

ADD-20

*Hochfelder*, 425 U.S. 185, 199 (1976). "[T]he purpose of securities law [is] to 'prevent practices that impair the function of stock markets in enabling people to buy and sell securities at prices that reflect undistorted (though not necessarily accurate) estimates of the underlying economic value of the securities traded.'" *SEC v. Masri*, 523 F. Supp. 2d 361, 371 (S.D.N.Y. 2007). But a market manipulation claim requires some form of deception that "differentiate[s] legitimate trading activities that permissibly may influence prices" from unlawful "ingenious devices that might be used to manipulate securities prices." *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 205 (3d Cir. 2001). Plaintiff must plead "false statements" or "illegitimate, deceptive trading techniques that mislead investors about the price or demand for a stock." *Id.* at 204. "[T]he essential element of a market manipulation claim is the injection of inaccurate information into the market." *Id.*

Because market manipulation cases often "involve facts solely within the defendant's knowledge . . . the plaintiff need not plead manipulation to the same degree of specificity as a plain misrepresentation claim." *ATSI Communications, Inc. v. Shaar Fund Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007). The plaintiff needs only "lay out the nature, purpose, and effect of the fraudulent conduct and the roles of the defendant without requiring specific instances of the conduct." *Nanopierce Techs., Inc. v. Southridge Cap. Mgmt., LLC*, No. 02-CV-0767-LBS, 2002 WL 31819207, at *5 (S.D.N.Y. Oct. 10, 2002).

The court previously dismissed Plaintiff's market manipulation claim because it did not adequately allege deception. The AC fails to add any new allegations suggesting that the digital dividend or the disclosures regarding the digital dividend were deceptive. Plaintiff simply adds an array of conclusory adverbs to the prior allegations relating to the dividend, claiming it was designed "exclusively" or "entirely" to harm short sellers by causing a short squeeze. These conclusory adverbs are not supported by facts and the court need not accept them as true. And, also

21

ADD-21

importantly, these new adverbs do not demonstrate that Overstock issued the digital dividend to deceive anyone.

Plaintiff's AC also adds a paragraph with eleven sub-bullets containing references to various statements that it alleges are related to the dividend–ten of which were included in the prior complaints. Plaintiff merely reshuffles these allegations, but they do nothing to demonstrate that there was confusion or a false impression in the marketplace with respect to the nature and impact of the digital dividend. The only new statement–Byrne's statement that registration of the dividend should obviate the concern about a short squeeze– simply states the obvious. There is nothing deceptive about that comment.

As with the prior consolidated Complaint, the AC fails to allege well-pled factual allegations that Overstock injected inaccurate information into the market regarding the digital dividend. Specifically, the AC does not plead any new facts concerning the description, nature, or terms of the dividend. The absence of such allegations is again fatal to Plaintiff's manipulative scheme claim. Defendants could not manipulate the market via truthful statements or via a dividend that everyone immediately knew would impact short sellers. It is undisputed that Overstock disclosed that the dividend would not be registered. The market knew the potential ramifications of that decision. Plaintiff claims there was deception by labeling Overstock's initial decision not to register the shares as illegal. But the AC pleads nothing to support a finding that the dividend was illegal.

Nothing alleged in the AC demonstrates that Overstock's plan to issue the dividend without first registering it with the SEC was somehow illegal. Despite arguing that it would have been illegal to issue the dividend shares as unregistered securities, Plaintiff identifies no law, statute, court decision, rule, regulation, regulatory guidance, or other authority from any source that such an act would purportedly violate. Nor does Plaintiff allege a contemporaneous fact that the SEC or

22

anyone else told Overstock that not registering the dividend was illegal or a violation of SEC rules. Because the dividend did not involve a sale under Section 2(a)(3) of the Securities Act, the shares issued in connection with it were not required to be registered.  15 U.S.C. § 77b(a)(3).  The Securities Act provides a comprehensive framework that provides for a number of circumstances where unregistered securities may be issued.  Plaintiff fails to allege that none of these exemptions applied to the digital dividend.  A company may issue unregistered securities for any number of legitimate business purposes and to avoid the time, expense, and burdens of the registration process. There is nothing inherently deceptive about issuing an unregistered security.

It is also entirely understandable that there might be disagreement with the SEC when dealing with a security that is new and unprecedented like the one here–a digital security intended to be traded on Overstock's alternative trading platform that was completely untested within the structures of the federal securities laws.  Plaintiff  claims that when Overstock filed a Form S-3 to register the dividend on September 24, 2019, "Overstock cited the guidance it had received from regulators making clear that the locked-up feature of the Dividend was not acceptable."  The AC, however, alleges that Overstock merely stated that it "appreciate[s] the cooperation and guidance we are receiving from regulatory authorities."  This statement does not support the claim that the "locked-up" feature of the dividend was unacceptable.  Absent clear case law precedent or some other way to have foreseen the regulators' actions, the court cannot infer illegal conduct simply from the fact that Overstock initially decided not to register the dividend shares and then ultimately decided to register the dividend shares.

Plaintiff also continues to argue that it need only plead a manipulative intent and that such an intent can be inferred from the true purpose of the Dividend, which was allegedly not to promote Overstock's move to blockchain technologies but to increase share prices for when Byrne cashed

out his shares.  But, even if Plaintiff need only plead an intent to manipulate, the securities laws did

not require Defendants to characterize the dividend as a short-squeeze when its impact on short

sellers was immediately apparent to the market.  And, Plaintiff's argument that Defendants allegedly

failed to disclose Byrne's intent to sell stock at some point in the future also fails to render the

dividend deceptive.  The law only requires executives to disclose stock sales two business days after

they happen.  17 CFR § 240.16a-3(g)(1).  Absent a duty to disclose these matters, Defendants'

alleged silence, which allegedly demonstrates an alleged intent to manipulate the market, cannot

serve as the basis for liability under Rule 10b-5.

Therefore, the court concludes that Count 2 fails because there is still no allegation that

Defendants misrepresented the nature of the dividend, that the dividend was unlawful, or that

Defendants needed to disclose that the actual purpose of the dividend was allegedly to hurt short

sellers and increase the price per share for a potential Byrne stock sale.  Plaintiff's market

manipulation claim regarding the digital dividend is based on an alleged grand scheme that requires

layers of speculation to be plausible, when such a claim must rest on well-pled facts to be viable.

Accordingly, the court dismisses Plaintiff's market manipulation claim under Count 2.

**3.  Scienter Under Counts 1 & 2**

Defendants argue that Plaintiff has not met the heightened scienter requirement under the

PSLRA.  Under the PSLRA, scienter must be pled with particularized facts that give rise to an

inference that is at least as cogent as any competing, nonculpable explanations for a defendant's

conduct.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).  The Tenth Circuit

has recognized that the inference of scienter "must be more than reasonable or permissible–it must

be cogent and compelling."  *Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1236-37

(10th Cir. 2016).  Scienter must be found as to each defendant and with respect to each of the

ADD-24

alleged violations of the statute.  The scienter allegations in the AC are slightly repackaged but are essentially the same allegations the court previously rejected as inadequate.

### a.  Nielsen

Plaintiff alleges that Nielsen is liable only for statements regarding the retail results and guidance made on August 8, 2019.  But the only facts that even purport to touch on his state of mind relate to information he allegedly learned about two weeks after the statements were made.  Those allegations fail to plead scienter.

### b.  Iverson

Plaintiff alleges Iverson is liable for both the alleged misrepresentations and scheme.   Under Count 1, the only challenged statement Iverson allegedly made concerns the D&O insurance and the dividend.  None of the new allegations regarding Iverson's purported scienter relate in any way to these challenged statements.  Instead they concern only the retail guidance and SEO, alleging that CW#0 was part of a conversation with Iverson about SEO and keyword rankings not being a meaningful metric and that Iverson supposedly knew the $20 million upside component of the initial guidance was unrealistic.  But Iverson is not alleged to have made any statements about retail guidance or SEO.  Thus, these allegations are irrelevant to whether he made false or misleading statements with scienter.

As to Count 2, the AC still pleads nothing about Iverson's purported involvement in the digital dividend.  In fact, as the court previously observed, by pleading that Byrne was responsible for the dividend, Plaintiff has conceded that neither Nielsen nor Iverson acted with scienter.  Plaintiff attempts to link Iverson's departure on September 17, 2012, to a presentation purportedly made to an unidentified group of executives about revised retail outlook.  But the AC alleges no facts plausibly connecting these events.  The presentation occurred a month prior to Iverson's

25

ADD-25

departure and after the challenged statements were made.  There is no allegation that Iverson even participated in the meeting.  Plaintiff previously attempted to connect Iverson's departure with the dividend, but now argues that it was suspicious because it occurred between the revised outlook and the downward revision to guidance.  But Plaintiff never actually states why the departure is suspicious.  As before, Plaintiff's statement that Iverson's departure was suspicious is not based on any supporting facts.  The court, therefore, concludes that Plaintiff's scienter allegations as to Iverson remain boilerplate and inadequate under the PSLRA.

### c. Byrne

As was the case previously, the majority of Plaintiff's scienter allegations focus on Byrne. As to Count 1, the only new allegations to address Byrne's mental state relate to retail guidance. But those allegations do not demonstrate that Byrne believed the guidance was unattainable when it was provided.  Allegations that other executives disagreed with Byrne's position does not demonstrate what Byrne believed.  In fact, it supports a finding that Byrne believed in his position enough for the other executive to know his position on it and that Byrne held that position in private as well as in public.  There is no allegation or suggestion that Byrne believed one thing privately and said another thing publicly.  The AC contains no well-pled facts suggesting that Byrne knew of or disregarded information contradicting the challenged statements at the time he spoke.  Also, with respect to the SEO claim under Count 1, the AC has contradictory information from the confidential witnesses as to whether SEO was improving.  These contradictory accounts do not demonstrate that Byrne was misleading the public when he spoke about SEO.  The AC fails to allege well-pled facts that would support an inference that Byrne knew, or had access to, information showing that SEO was not improving.

As to Count 2, the AC alleges that Byrne was the driving force behind the digital dividend.

ADD-26

Although the AC repeatedly claims that Byrne proposed the digital dividend to increase share price so he could sell his common stock when he left Overstock, the AC fails to plead with particularity facts giving rise to a strong inference that Byrne intended to deceive investors by artificially affecting the market price of the securities through issuance of the digital dividend.

The AC is full of allegations regarding Byrne's animosity toward short sellers and purported admissions that he intended to create a short squeeze. But these allegations are beside the point. Plaintiff does not allege that Byrne misrepresented the nature of the dividend or attempted to conceal that it would not be registered and immediately available for resale. The AC alleges nothing that would warrant the court changing its conclusion that Plaintiff has not pled any intent to deceive short sellers or the market as a whole with respect to the impact the dividend would have on short sellers.

Plaintiff again relies on Byrne's stock sales for scienter. But neither the timing nor amount of his sales was dramatically out of line with past trading practices. And stock sale allegations have no independent significance as they illustrate nothing more than motive and opportunity, which is insufficient under the PSLRA. The AC, like the prior complaint, does not explain how Byrne's stock sale in May 2019 was related to the dividend or an intent to defraud. The May sales occurred in the days immediately following the company's announcement of Q1 2019 results–precisely when Byrne would be expected to sell because new material non-public information had just been disclosed.

Plaintiff claims it has alleged scienter based on Byrne's departure and subsequent stock sale, his purported flight to another country, and the SEC's investigation. Plaintiff's allegations are based on Byrne's vague after-the-fact statements that he expected to leave the company at some unidentified time. The AC does not allege that Byrne's September 2019 stock sales, after he

ADD-27

resigned, were based on inside information.  Short sellers and analysts recognized the practical

effect of the dividend and the market had the same information as Byrne.  Plaintiff ignores its own

allegation that Byrne did not have inside information after he left his employment.  Therefore, the

timing of Byrne's stock sales do not support an inference of scienter.

Byrne's alleged flight proves nothing about his state of mind with respect to the digital

dividend.  Byrne had a number of unrelated matters going on in his life at the time of his alleged

flight that could have caused him to leave the country.  It is pure speculation that he may have left

the country because he believed he had engaged in securities fraud.  Byrne's statements at the time

actually indicate that he did not believe that he had done anything wrong.  And Byrne is here

defending the action, still holding to the position that he did not do anything wrong.  Plaintiff's

speculation does not support an allegation of scienter.  Moreover, the fact that the SEC later

initiated an investigation proves nothing about scienter at the time of the statements.

The court agrees with Defendants that it defies common sense that Defendants would

attempt to issue an "illegal" dividend or attempt to mislead investors by fully disclosing their plan

not to register the dividend.  Viewed holistically, Plaintiff's scienter allegations do not create the

strong inference required by the PSLRA.

### 4.  Reliance Under Counts 1 & 2

Defendants argue that Plaintiff's claims under Counts 1 & 2 also fail because the AC does

not allege that Plaintiff relied on any challenged statement or actions in purchasing Overstock

shares.  The court did not previously rule on this argument.  However, the United States Supreme

Court has made clear that "[r]eliance by the plaintiff upon the defendant's deceptive acts is an

essential element of the § 10(b) private cause of action."  *Stoneridge Inv. Partners, LLC v. Sci.-*

*Atlanta, Inc.*, 552 U.S. 148, 159 (2008).

28

ADD-28

Plaintiff seeks to invoke the legal presumption of reliance under *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128, 153 (1972). *Affiliated Ute* allows a court to presume reliance where a fraud theory rests primarily on the omission of material information. Under Count 1, Plaintiff's new allegations only address the retail guidance and SEO statements, which are alleged affirmative misrepresentations. Therefore, the *Affiliated Ute* presumption does not apply to Count 1. Under Count 2, Plaintiff claims that the market manipulation of the digital dividend was based on Defendants' alleged failure to tell investors the true reason for issuing the digital dividend and the locked-up mechanism used to harm short sellers. While a failure to divulge their intent behind the dividend appears to allege omissions, Plaintiff's allegations make clear that it is challenging affirmative conduct–the issuance of "a digital dividend that was not freely tradeable and thus could not be purchased by short sellers . . . This conduct constituted devises, schemes, and artifices to defraud." Am. Compl. ¶ 328. Thus, Plaintiff's dividend claim primarily focuses on the locked-up feature of the dividend and is challenging affirmative conduct. Simply claiming that the manipulative scheme is the failure to disclose the alleged scheme behind the affirmative conduct does not allow invocation of *Affiliated Ute* presumption. To permit such an interpretation of the presumption would "swallow the reliance requirement [under *Affiliated Ute*] almost completely." *Joseph v. Wiles*, 223 F.3d 1155, 1163 (10th Cir. 2000).

Plaintiff also relies on the *Basic* fraud-on-the-market presumption, which is "based on the idea that individuals relied on the integrity of the market price." *In re PolyMedica Corp. Sec. Litig.*, 224 F.R.D. 27, 44 (D. Mass. 2004), *vacated and remanded on other grounds*, 432 F.3d 1 (1st Cir. 2005). "Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance." *Basic Inc. v. Levinson*, 485 U.S. 224, 248 (1988). Because

29

ADD-29

Plaintiff is a short seller of Overstock securities, it does not dispute that its only purchases during the class period were pursuant to pre-existing contractual obligations it entered into before the alleged fraud began and it made those purchases to avoid breaching its pre-existing contractual obligations. These obligations, not the fair market price, caused Plaintiff to purchase shares during the class period. Plaintiff appears to concede it would have purchased no matter the price. The *Basic* presumption is inapplicable where "price [played] no part whatsoever in [Plaintiff's] decision making." *Levie v. Sears Roebuck & co.*, 496 F. Supp. 2d 944, 949 (N.D. Ill. 2007). Therefore, the court concludes that Plaintiff has not demonstrated reliance under Counts 1 or 2.

**B. Count 3 – Section 20(a) Control Person Liability**

Because the court has found that the AC does not state a primary violation of Section 10(b) or Rule 10b-5 against Defendants, Plaintiff cannot state a Section 20(a) control person claim under Count 3 against the individual Defendants. *City cf Phila. v. Fleming Cos., Inc.*, 264 F.3d 1245, 1270-71 (10th Cir. 2001). And, as the court previously ruled, even if there is a primary violation of Section 10(b) or Rule 10b-5, Plaintiff's control person claim under Section 20(a) also fails against because Plaintiff has not pled sufficient facts demonstrating that Nielsen or Iverson had control over the primary violators or that Byrne would be anything other than a primary violator. Accordingly, the court dismisses Plaintiff's Section 20(a) cause of action against the individual Defendants and grants Defendants' motions to dismiss Count 3 of the AC.

**C. Count 4 – Section 20A Insider Trading Claim Against Byrne**

Under Count 4, Plaintiff claims that Byrne violated Section 20A by using material nonpublic information to sell his Overstock common shares at inflated prices. The court previously dismissed Count 4 against Byrne because Plaintiff failed to plead a predicate violation of the securities laws and because Plaintiff was not a contemporaneous trader.

ADD-30

The court has again determined that there is no predicate violation of the securities laws. The Tenth Circuit has recognized that "[c]ourts have interpreted § 20A as requiring the plaintiff to plead a predicate violation of the 1934 Act or its rules and regulations." *Sterlin v. Biomune Sys.*, 154 F.3d 1191, 1194 n.5 (10th Cir. 1998); *In re Crocs Sec. Litig.*, 774 F. Supp. 2d 1122, 1155-56 (D. Colo. 2011) (collecting cases requiring plaintiff to plead a predicate violation of securities laws).

And, with respect to whether Plaintiff was a contemporaneous trader, the legal analysis has not materially changed. Plaintiff alleges that Byrne's stock sales occurred after Plaintiff purchased Overstock shares. Because Plaintiff traded before Byrne, the purported insider, Plaintiff's Section 20A claim fails. *In re Enron Corp. Sec. Derivative & ERISA Litig.*, 258 F. Supp. 2d 576, 599-600 (S.D. Tex. 2003).

Therefore, the court concludes that Plaintiff has failed to state a Section 20A claim against Byrne because it has not stated a predicate securities law violation and it was not a contemporaneous trader with Byrne. Accordingly, the court grants Byrne's motion to dismiss Count 4 of the AC.

**D. Request to Amend**

Plaintiff requests leave to amend should either motion to dismiss be granted. Plaintiff states that if given leave, it will include new facts including Overstock's February 26, 2021 disclosure that it received a new subpoena from the SEC regarding retail guidance and additional detail regarding CW#0's title and responsibilities. However, an amendment on these grounds would appear to be futile. The SEC's initiation of an investigation is largely irrelevant to the issues before the court. In addition, the court did not discount CW#0's allegations based on the lack of detail regarding his title and responsibilities. Rather, his allegations were vague and many were based on opinions with respect to future projections, not facts that could be right or wrong. Moreover, Plaintiff's request to

31

plead additional facts as to Byrne's general credibility and honesty does not explain how such

general matters would be relevant to the specific issues before the court.  The court is unaware of

any case law allowing a fraud claim to proceed because a defendant is generally untrustworthy.  As

discussed above, such cases have heightened pleading requirements that require specific allegations.

The court believes it has given Plaintiff an adequate opportunity to plead its case and repeated

amendments would be futile.  Therefore, the court denies Plaintiff's request for leave to amend.

<b>CONCLUSION</b>

Based on the above reasoning, the court GRANTS the Overstock Defendants' Motion to

Dismiss Plaintiff's Amended Consolidated Complaint [ECF No. 125], and  Defendant Patrick M.

Byrne's Motion to Dismiss Plaintiff's Amended Consolidated Complaint [ECF No. 124].

DATED this 20th day of September, 2021.

BY THE COURT:

Dale A. Kimball,
United States District Judge

32

ADD-32

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| IN RE OVERSTOCK SECURITIES LITIGATION | **JUDGMENT IN A CIVIL CASE** |
| | Case No. 2:19-CV-709-DAK-DAO |
| **THE MANGROVE PARTNERS MASTER FUND, LTD.,** | Judge Dale A. Kimball |
|             Lead Plaintiff, | Magistrate Judge Daphne A. Oberg |
| v. | |
| **OVERSTOCK .COM, INC., PATRICK M. BYRNE, GREGORY J. IVERSON, and DAVID J. NIELSEN,** | |
|           Defendants. | |

Based on this court's September 20, 2021 Memorandum Decision and Order dismissing Plaintiff's Amended Consolidated Complaint against all Defendants, Plaintiff's action is dismissed with prejudice.

DATED this 20th day of September, 2021.

BY THE COURT:

_____

DALE A. KIMBALL
United States District Judge

ADD-33

## Certificate of Digital Submission

Counsel for Appellant hereby certifies that all required privacy redactions have been made, which complies with the requirements of Federal Rules of Appellate Procedure 25 (a)(5).

Counsel also certifies that the hard copies submitted to the Court are exact copies of the ECF filing of January 28, 2022.

Counsel further certifies that the ECF submission was scanned for viruses with the most recent version of a commercial virus scanning program (Vipre software version 12.2.8079; Definitions version 98718 – 7.91036 [January 28, 2022 Vipre engine version 5.6.7.7 – 3.0), and according to the program, is free of viruses.

*/s/ Michael B. Eisenkraft*
Michael B. Eisenkraft

## Certificate of Service

I hereby certify that on January 28, 2022, I caused to be filed a true and correct copy of the Lead Plaintiff-Appellant's Opening Brief and the Joint Appendix (Volumes I through VIII) with the United States Court of Appeals for the Tenth Circuit by using the appellate CM/ECF system. I further certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Michael B. Eisenkraft
Michael B. Eisenkraft